IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

UNITED STATES OF AMERICA, .   Case No.  7:20-CR-00355-DC
                            .
          Plaintiff,        .
                            .
     v.                     .
                            .
MARTIN RENTERIA,            .
                            .
          Defendant.        .   Wednesday, November 10, 2021
. . . . . . . . . . . . . . .   8:50 A.M.

TRANSCRIPT OF JURY TRIAL, DAY THREE
VOLUME 4 OF 4
BEFORE THE HONORABLE DAVID C. COUNTS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      United States Attorney's Office
                         BY:  MONICA DANIELS, ESQ.
                         400 West Illinois Avenue, Suite 1200
                         Midland, Texas 79701

                         Department of Justice
                         Child Exploitation & Obscenity Section
                         BY:  AUSTIN BERRY, ESQ.
                         601 North Loraine, Suite 398
                         Midland, Texas 79701

                         Department of Justice
                         BY:  ALICIA ANN BOVE, ESQ.
                         1301 New York Avenue NW
                         Washington, DC 20005

APPEARANCES CONTINUED ON NEXT PAGE.

Deputy Clerk:            Cristina Lerma
                         United States District Court
                         200 East Wall Street, Room 222
                         Midland, Texas 79701

ECRO:                    Samantha Granado

Transcription Company:   Liberty Transcripts
                         7306 Danwood Drive
                         Austin, Texas 78759
                         (847) 848-4907
                         www.libertytranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Defendant:        Office of the Federal Public Defender
BY:  ANTHONY J. COLTON, ESQ.
     JOHN J. VELASQUEZ, ESQ.
200 East Wall Street, Room 110
Midland, Texas 79701

Office of the Federal Public Defender
BY:  DALE F. OGDEN, ESQ.
2205 Veterans Blvd., Suite A-2
Del Rio, Texas 78840

INDEX

<u>Page</u>

Continuation of Jury Trial from November 9, 2021    5

Defense Rests    52

Government's rebuttal case in chief    53

Government rests    57

Court's Final Jury Instructions    86

Closing Argument by the Government    109,119

Closing Argument by the Defense    117

Jury Retires to Deliberate    121

Verdict    135

Jury Polled on Verdict    136

End of Proceedings    140

Certificate of Transcriber    141

INDEX

WITNESSES
                                                        Page
FOR THE GOVERNMENT:

CHRISTOPHER VILLA
  Direct Examination by Mr. Berry                        53


FOR THE DEFENDANT:

MARTIN RENTERIA
  Direct Examination by Mr. Colton                       13
  Cross-Examination by Mr. Berry                         19


EXHIBITS:                              ID        EVD

FOR THE GOVERNMENT:

 (None)


FOR THE DEFENDANT:


 (None)

(Outside the presence of the jury, defendant present)

THE COURT: All right. So we're back in session outside the presence of the jury. And had a little difficulty with one alternate, as you all know, getting here. He's made it. It wasn't his fault. Completely unavoidable. But he's here now, I'm told.

All right. So where we left it last night, we got everybody here including Mr. Renteria. Mr. Colton, Mr. Renteria, you had called Mr. Renteria to the stand. Is that still the plan?

MR. COLTON: Yes, Your Honor.

THE COURT: Okay. So, Mr. Renteria, let me have the Marshals bring you on up here. And I want to ask you a few more questions once we get you up here on the microphone.

MR. COLTON: And, Your Honor, just for the record, we would re-urge the sequestration rule to have any witnesses removed from the courtroom.

THE COURT: Yeah. Mr. Berry?

MR. BERRY: I think Mr. Villa should be entitled to be in here. The Defense has made him the centerpiece of their defense, that he is the one to blame, not the Defendant. And the jury has now seen him in the courtroom. We've called him out with Detective Rodriguez on the stand. If he were to be moved at this point, Mr. Renteria --

1          THE COURT:  Go ahead.  I'm listening.

2          MR. BERRY:  He would not have an opportunity to hear

3  the accusations that the Defendant is going to make against

4  him.  And I think he should be allowed to hear that so that he

5  can rebut that when he's in here when he testifies in rebuttal.

6          THE COURT:  I'll grant the Defense request to have

7  him, have Mr. Villa sequestered.  The Government's points are

8  well taken.  However, I think that he should be treated like

9  every -- Mr. Villa, I'm going to have -- we'll swear you when

10 you come testify, if you do.  I'm going to have you excluded

11 from the trial while Mr. Renteria testifies.  And basically

12 under the rule the Defense has requested.  You may or may not

13 be called.

14         And so rather than have you sit here and listen to

15 his testimony, the attorneys can ask you questions and you can

16 answer without having been, you know, human nature, you know,

17 may change our minds or answers or memories just from listening

18 to other people.  You've listened to some other testimony, but

19 you were never listed as a witness.

20         It now becomes apparent with Mr. Renteria taking the

21 stand, which the Government didn't know until last night, nor

22 did the Court.  And so I'm not going to keep you from

23 testifying if the Government wishes to call you.  But I am

24 going to have you excluded while Mr. Renteria testifies.

25         So we're going to have you placed somewhere, wherever

the Government wants to place you, where you can't see or hear
the trial. Okay? That's basically it. You can go with
Detective Rodriguez. Thank you.

Now, Mr. Renteria, you're Martin Renteria, right?

THE DEFENDANT: Yes.

THE COURT: Okay. You can remove your face covering
at least while we talk. And then when the jury comes back,
I'll have you place it back on. But, all right. And you and I
talked last night. I know you have talked with your attorneys.
All three of them I saw visiting with you and talking to you
last night before you told me for sure that you wanted to
testify.

I told you think about it overnight. This will give
you a chance to think about it overnight. So I'm not going to
dive into what the attorneys told you, whether they encouraged
you to testify, they've discouraged you from testifying,
whatever it may be. The point is you've been fully advised by
three very seasoned attorneys, very good lawyers.

Whatever that advice was, you've chosen to take the
stand. Is that right?

THE DEFENDANT: That's correct.

THE COURT: And to testify. And you realize, as
we've talked about yesterday, you understood what we went
through yesterday earlier in the day, that when Mr. Colton
passes you, and you take the stand, you take the stand for all

purposes.  And so Mr. Berry or one of the other attorneys from the Government has the right to cross-examine you.  Just like your attorney has been cross-examining witnesses, your attorneys have been cross-examining witnesses, they then get to, you know, one of them gets to cross-examine you.  You understand?

THE DEFENDANT:  I understand.

THE COURT:  And you don't get to say well, I choose to answer this question but I choose not to answer that question.  You're going to have to, you know, unless your attorneys, you know, jump up and give me a reason that you don't have to answer something, then you're going to have to answer.  And I would think you should consider, you know, worst case scenario, you're going to have to answer everything.  You understand?

THE DEFENDANT:  Uh-huh (affirmative).

THE COURT:  Yes?

THE DEFENDANT:  Yes.

THE COURT:  And whether you like it or not, you're going to have to answer it.  Yes?

THE DEFENDANT:  Yes.

THE COURT:  Now, we've talked about this before.  I think we may have talked a few -- a week or two ago when we had a final pretrial, I guess about a week ago.  And so this may be old news to you.  And Judge Griffin downstairs in the

magistrate courtroom may have told you this, as well.  The
nature of a federal trial is that typically, not always but
typically, way more often than not a defendant who's on a
criminal trial in federal court is convicted.

There are different reasons for that, of course.
And, like I say, if you are acquitted, then that's 100 percent
of your case.  But there's, I would probably guess, and I've
seen it in case law before where, you know, your chances are
pretty slim of winning this trial.  Now -- of walking away
acquitted.

That doesn't mean you won't.  Okay?  That's up to the
jury, not me or anyone else.  And so the nature of the
business, however, is that once someone's convicted, later in
prison they're going to complain about their case, right, to
try to get some relief, to try to get some remedy to either get
them less time in prison or acquitted altogether somehow, or
the conviction set aside, something along those lines.
Reversed, whatever it may be.

To do that, you've got -- you, the Defendant, the
accused, if you're convicted, you got to find something that
typically at least, maybe not exclusively but usually, that
your attorney did or did not do, did something he shouldn't
have done or didn't do something he should have done, omitted
doing, or the Court did that, or the Government did that, any
of us did that.  Not you.  It can't be from what anything you

decided to do on your own because that won't give you any
relief, right, because the appellate courts would just say
well, you chose to do that.

That's what I'm trying to tell you now is that you're
going to testify, you've told me you're going to.  I've not
brought the jury in yet.  They're coming in momentarily.  And
there's not going to be any real change in your mind, you know,
at that point because you're already in the witness box because
we don't want them to see that your legs are shackled.

So again, it's got to be your attorneys' fault, the
Government's fault, or the Court's fault.  And I'm telling you
now, you're making this decision, and you're telling me you're
making this decision.  And so you're not going to be able to
come back and say I wouldn't have testified if my lawyers had
not, you know, had told me not to or whatever because I'm
telling you they have fully advised you.  I know that.  And
you've told me that, right?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So this is your choice, correct?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So you're basically -- you need to
consider that while you're not technically doing it, you're
pretty much foregoing an argument about your testimony, about
your decision to testify on appeal.  You understand that?

THE DEFENDANT:  Yes.

1          THE COURT:  Okay.  Is it still your desire to

2     testify?  Yes or no?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  You shook your head yes but you

5     didn't say anything, and you looked off to the side.  So I

6     thought okay, what does that mean.  You plan to testify, okay.

7     Let me ask the Marshal to come up here.

8          All right.  So what we're going to do, Marshals are

9     going to take Mr. Renteria just outside the courtroom, going to

10    remove those leg chains just so there's absolutely no -- and

11    they've wrapped them, just for the record, I noticed yesterday

12    and looked at them.  Once Mr. Ogden made the complaint, and I

13    don't blame him.  I think it's a righteous complaint.

14         I don't think there had been any harm done, but we

15    don't want anybody to know that he's in custody.  They can

16    assume what they want.  Oftentimes, jurors don't even think

17    about that.  And some of them think that we're all in custody,

18    frankly.  But they're going to take his chains off so that

19    there's no chance.

20         And like I say, yesterday they had it wrapped with

21    electrician's tape, black electrician's tape.  But there still

22    might have been, you know, what connected to the actual cuff,

23    there still might have been some metal-on-metal, and we don't

24    want that to happen.

25         So the jury's going to come in.  Mr. Renteria, when

1 the jury comes in, you'll rise with all of us, but you'll stay
2 in your box. Stay in the box, but stay -- you can push the
3 chair back just a little bit, but stay right there, watching
4 for that microphone. You've seen what people do if they rub it
5 with their clothes. So don't do that.
6       And then I'll have everybody sit down. But you,
7 you'll stay standing. He'll call you. I'm going to have him
8 call you again. He did it last night but I'm going to have him
9 call you formally. We'll have you sworn by the courtroom
10 Deputy. And then I'll have you sit down and remove your face
11 covering at that time. Okay?
12       THE DEFENDANT: Okay.
13       THE COURT: We good? We good? All right.
14       Mr. Colton, you're good?
15       MR. COLTON: Yes, Your Honor.
16       THE COURT: Mr. Berry?
17       MR. BERRY: Ready, Judge.
18       THE COURT: All right. Let's bring the jury in.
19 Let's rise for the jury, please.
20     (Jury in at 9:00 a.m.)
21       THE COURT: All right. Let's all be seated except
22 for Mr. Renteria. Welcome back. Good morning. Glad to have
23 you all back. I'm sorry we're starting a little late. It
24 wasn't anybody's fault, it was just one of those things. And
25 we're just glad to have everybody back here safely.

1          Mr. Colton, your next witness, sir.

2          MR. COLTON:  Yes, Your Honor.  We would call

3   Mr. Martin Renteria.

4          THE COURT:  Mr. Renteria, if you would raise your

5   right hand, please, and be sworn.

6               MARTIN RENTERIA, DEFENDANT, SWORN

7          THE COURT:  You may have a seat, and you may remove

8   your face covering.  Thank you, sir.

9          Mr. Colton, whenever you're ready, you may proceed.

10          MR. COLTON:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12   BY MR. COLTON:

13   Q    Mr. Renteria, can you please state your name for the

14   record, and spell your last name.

15   A    My name is Martin Renteria.  And my name is spelled

16   R-E-N-T-E-R-I-A.

17   Q    All right.  So I'm going to ask you a few questions about

18   your case.  And you know the most important thing is to tell

19   the truth, right?

20   A    Yes.

21   Q    Okay.  So we're just going to get right down to it.  In

22   2005, you were accused of sexually molesting Victim-3

23   [redacted]?

24   A    Yes.

25   Q    All right.  What happened?

1  A    You want the entire -- the entire story, the long version?

2  Q    Tell me --

3  A    Okay.

4  Q    Tell me what happened.   Yeah.

5  A    My son and the neighbor were friends.   It was -- it was

6  the younger brother who was the -- the main friend.   He was

7  closer in age to my son.   And they would play great together.

8  And I invited both Victim-3 [redacted] and Brother of Victim-3

9  [redacted] over.   Victim-3 [redacted] had been -- Victim-3

10 [redacted] had been outside in the front yard while we were

11 washing my car.   And my son and him were having a water fight.

12 And they seemed to be getting along pretty good.

13     And so I said well, why don't the both of them come over

14 because we have movie nights.   We had various nights at my

15 house.   I was a single parent.   I had my son was seven, a very

16 young seven.   And my daughter was four.   And we would have

17 nights, pizza night, movie night, story night.   Stuff like

18 that.

19     And we invited them over for movie night.   The plan was to

20 watch -- watch a scary movie and hang out.   That's it.   And so

21 when after my -- my children had finished bathing and got ready

22 for movie night, I went over across the grass and I said hey,

23 can the boys come over now.   And Mother of Victim-3 [redacted]

24 said that Victim-3 [redacted] had fallen asleep.   But I had

25 already invited both of them, so I said well why doesn't

1  Victim-3 [redacted] come over.

2       And so that is what we did.  During the time that -- that

3  we were there, we made popcorn.  I sat on one couch with my

4  son, and Victim-3 [redacted] sat on the love seat.  And after

5  the movie was over -- well, actually we watched two movies.

6  And after the evening was over, I walked Victim-3 [redacted]

7  back over to his house.

8            We shared a grass, and he was -- he was the next-door

9  neighbor.  And that was that.  Three days later, I was arrested

10 and told that I had -- I had a charge of child molestation,

11 three counts.

12 Q    So you deny molesting Victim-3 [redacted]?

13 A    Yes.

14 Q    Okay.  So again, in 2015, you were again accused of

15 sexually molesting, this time a boy named Victim-2 [redacted].

16 A    Yes.

17 Q    All right.  What happened?

18 A    I was at a barbeque with a whole bunch of friends.  We had

19 -- we had a church group.  And there was alcohol involved.  And

20 we were drinking quite, quite heavily.  All of us were.  And

21 they -- they encouraged me to spend the night instead of

22 driving home.  And I made the choice of saying yes, that's the

23 smart thing to do.  I'll sleep on the couch.

24      And at some point in the night I got up, and I wound up

25 going to the bed and laying in the bed.  And in the morning

1  time, I was -- I was back on the couch, and that was that.  A

2  couple days later, maybe about a week or two later, somewhere

3  -- somewhere around there I was called into the police station

4  to answer some questions, and I was arrested.

5  Q    Okay.  And so do you deny sexually molesting Victim-2

6  [redacted]?

7  A    Yes.

8  Q    And you realize that's two times, right?

9  A    That is two times.

10 Q    So that's some pretty bad luck.

11 A    That is bad luck.

12 Q    Okay.  But you still deny that any of those things,

13 inappropriate things happened?

14 A    Yes.

15 Q    All right.  Now, we're here again on a third time.  Right?

16 A    Yes.

17 Q    Okay.  So did you sexually molest Victim-1 [redacted]?

18 A    No.

19 Q    Okay.  Why would Victim-1 [redacted] lie?

20 A    I think that's -- I think that's an answer that only he

21 can answer.  But I -- I know that I did not molest Victim-1

22 [redacted].

23 Q    All right.

24 A    I'm not going to sit here and -- and call a child a liar

25 in front of a court.  That's something within himself that he

1  -- he's got his reasons for.

2  Q    Okay.  Now some of the things that they've talked about in

3  this case, specifically with Victim-1 [redacted] is that you

4  bought things for him.

5  A    Yes.

6  Q    Why did you buy him things?

7  A    He was earning them.  He had come over one morning, and he

8  -- he seemed very ambitious, and I was impressed by that.  He

9  knew what he wanted as a kid, and he was willing to work for

10 it.  So I was willing to help out and say okay, I got some

11 things for you to do.

12     I said but, I want you to go home, ask your parents first

13 if it's okay.  And his dad came over and helped him mow the

14 grass, showed him how to mow the grass.  And we became friends

15 after that.  We started talking, and -- and then became more

16 acquainted.

17 Q    Okay.  And you've seen though the price tags on some of

18 these things that you bought for Victim-1 [redacted], right?

19 A    Yes.

20 Q    Bike for $400?

21 A    Yes.

22 Q    A hoverboard, $250?

23 A    Yes.

24 Q    And so your testimony is that an 11-year-old boy did

25 enough work to earn those things?

1  A    He did.  He was constantly over.  There's been -- we've

2  seen video of him coming and coming and coming.  He was always

3  over.  So there would be little things.  And little things add

4  up when it comes to odd jobs.  They add up.  And they added up

5  pretty quickly.  Within two weeks of him coming over, he was

6  able to have enough money accumulated from the jobs that he's

7  done to buy the hoverboard and the cart.

8       And -- and even though the bike is -- seems steep, it's

9  good quality.  And we had a conversation one time about he's

10 working a lot, he's -- he's making money.  And it's a great

11 idea to save money, but don't be afraid to pay for quality.

12      And when I bought the bike, some of that was in good

13 faith.  He had already -- he had already accumulated about $100

14 worth of credit with me from the odd jobs that he was doing.

15 And so I bought the -- I paid for the rest on good faith.  And

16 the tax I was willing to pay for on my own.  That's -- that was

17 just thrown in.

18      And -- and like I said, Peyton's has a great reputation

19 for having quality bikes.  And I had a bike as a child.  And if

20 he was going to buy something, I wanted -- I wanted to help him

21 buy something that was going to last.  And the quality of that

22 particular bike should last him until he's able to drive.  It's

23 a perfect height for him to grow in and basically be rough with

24 it, and it will last.

25 Q    Okay.  And so just to reiterate, your testimony -- you've

1  been accused three different times.  But your testimony is you

2  have never molested a child?

3  A    I have never molested a child.

4         MR. COLTON:  I'll pass the witness, Your Honor.

5         THE COURT:  Mr. Berry, your witness.

6         MR. BERRY:  Just a second to move my --

7         THE COURT:  Yes, sir.

8                   CROSS-EXAMINATION

9  BY MR. BERRY:

10  Q    Good morning, Mr. Renteria.

11  A    Good morning.

12  Q    Would you like to apologize to Victim-3 [redacted]?

13  A    For?  No, not for -- you're saying for sexually assaulting

14  him?

15  Q    Yes.

16  A    Is that what you're saying?

17  Q    Yes.

18  A    No.

19  Q    Would you like to apologize to his mother, Mother of

20  Victim-3 [redacted]?

21  A    No.  I wouldn't like to.

22  Q    Would you like to apologize to his sister, Sister of

23  Victim-3 [redacted]?

24  A    I don't know Sister of Victim-3 [redacted].  But no.

25  Q    Would you like to apologize to Victim-2 [redacted]?

1  A    No.

2  Q    Would you like to apologize to his mother?

3  A    No.

4  Q    Would you like to apologize to his father?

5  A    No.

6  Q    Would you like to apologize to Victim-1 [redacted]?

7  A    No.

8  Q    Would you like to apologize to Victim-1's [redacted] dad

9  sitting back there?

10  A    No.  Not for molesting him.

11  Q    For not what?

12  A    Not for -- not for molesting him as if you're saying.  Not

13  -- not for molesting him.

14  Q    Do you want to apologize to him for anything else?

15  A    No.

16  Q    So the unluckiest guy on the planet, that's your defense?

17  A    No, it's not just luck.  It's not unlucky.  That's not --

18  I mean, it's just not chance that that happens.  It's -- let me

19  explain the first case, the rest of it.

20  Q    I think you just did.  You explained it to your attorney.

21  I'm asking you the questions.  So you're the unluckiest guy on

22  the planet; yes or no?

23  A    No, I'm not the unluckiest guy on the planet.

24  Q    Are you a little bit unlucky?

25  A    It can happen.  Yes.

1  Q    It can happen?

2  A    Well, I mean, luck is -- luck is a -- a concept.

3  Q    Would you consider yourself of average intelligence, above

4  average intelligence, below average --

5  A    I think I'm your average person.

6  Q    Okay.  So average intelligence.  And in 2005, an 11-year-

7  old accuses you of sexually assaulting him?

8  A    Yes.

9  Q    You go to prison.  Get out.  And within a year, another

10 10-year-old boy accuses you.  Isn't that right?

11 A    Yes.  And their family.  The 10-year-old boy and their

12 family accused me.

13 Q    And at that point, did you think maybe, just maybe I

14 should stay away from 10- and 11-year-old boys?

15 A    It's -- I have -- I have friends and family.

16          MR. BERRY:  Objection, non-responsive.

17          THE COURT:  Sustained.  Answer the question.

18 BY MR. BERRY:

19 Q    Did you or did you not think after the second boy accused

20 you of sexual assault that maybe, just maybe you should stay

21 away from 10- and 11-year-old boys?

22 A    I had nothing to -- I had nothing to -- to think I was in

23 the wrong.  So, no.

24 Q    Because you wanted to be around 11-year-old boys, right?

25 A    I wanted to be around people.  That was --

1  Q    Short people that are about 11-years-old, right?

2  A    No.  They're family.  They're family and people.  And if

3  they happen to have a child, that's that.  It's -- it's -- you

4  can't avoid people and families.  The friends that I have, the

5  family members that I have either have grandchildren or

6  children.  You're going to -- you're going to socialize with

7  people who have children.

8  Q    Have you ever published any books, written any books?

9  A    No.

10  Q    You're not a published author?

11  A    No.

12  Q    Because it seems like you wrote the book on child

13  molesting here, Mr. Renteria.

14  A    I can see why you would say that.

15  Q    Have you ever lied under oath?

16  A    No.

17  Q    You haven't?

18  A    Oh.  Well, when I was -- when I was -- when I was maybe

19  20, I had given false information to police at one time.

20  Q    You did?

21  A    Yes.

22  Q    Tell us about that.

23  A    I was in college, and the -- the insurance law had come

24  out.  And I accumulated quite a bit of tickets because I could

25  not afford insurance.  And I was -- I was -- I was just a day,

1 maybe a day or two before finals and I had gotten pulled over.

2 And I told the police my brother's name so that I can make

3 finals.

4     I wound up missing the finals, and shortly after that I

5 joined the Navy and just left it behind me.

6 Q    So what is it exactly you lied about?

7 A    I gave -- I gave the police my brother's name instead of

8 my name.

9 Q    Why did you do that?

10 A    Because -- because I had finals, and I was trying to make

11 them the next day.  I was -- I was trying to just continue on

12 and get my education done.

13 Q    You were trying to save yourself in that situation?

14 A    Yes.

15 Q    You've never lied under oath again?

16 A    Not that I remember.

17 Q    Did you plead guilty to sexually assaulting Victim-3

18 [redacted]?

19 A    I did plead guilty.

20 Q    Did you stand up in court and take an oath?

21 A    Yes.

22 Q    Did you tell the Court you were guilty?

23 A    Yes, I did.  And shortly after, I wrote the judge --

24         MR. BERRY:  Objection, non-responsive.

25         THE COURT:  Mr. Renteria, he asks the questions.  You

1  answer them.

2          THE WITNESS:  Yes.

3  BY MR. BERRY:

4  Q    So when you pled guilty in 2005, you lied then is what

5  you're telling this jury now?

6  A    I guess you would put it that way, yes.

7  Q    Well, I'm not putting it that way.  You're putting it that

8  way.  Did you or did you not lie in 2005?

9  A    Yes.  Yes.

10  Q    What did you lie about?

11  A    That I -- well, in that context, that I was guilty when I

12  wasn't.  That is a lie.

13  Q    So you lied under oath a second time now, correct?

14  A    That would -- that would -- that would add up.  Yes.

15  Q    And you stood up just like you did today and swore to tell

16  the truth, the whole truth, and nothing but the truth, so help

17  you God?

18  A    Yes.

19  Q    Was there a judge there like Judge Counts?

20  A    There was a judge there.

21  Q    And you said I promise not to lie?

22  A    Yes.

23  Q    But you lied?

24  A    Yes.

25  Q    And you just took the oath today.

1  A    Yes.

2  Q    And you promised not to lie.

3  A    Yes.

4  Q    Are you lying today, or were you lying then?

5  A    I was lying then.

6  Q    Okay.  Lying then.  But not today.

7  A    Not today.

8  Q    The jury can trust you today?

9  A    Yes.

10 Q    Why can they trust you?

11 A    I'm past that.  That's -- that's history.  Today's a whole

12 different day.  Today's a whole different thing.

13 Q    You're past that?

14 A    Well, yes.  I mean, that's -- that's in the past.  You

15 know, and -- and there were circumstances that led to that.

16 Q    That sounds an awful lot like what you said in 2015 to

17 Detective Mitchell.  That sounds a lot like what you said in

18 2015 when Detective Mitchell asked you what was going on.  And

19 you said I'm past that.

20 A    I am -- I was -- I admitted that I violated parole in with

21 -- in with Detective Mitchell.  I was truthful.

22 Q    You were truthful about which part?

23 A    That I -- that I had violated conditions of parole.  I was

24 truthful with Detective Mitchell.

25 Q    When you got on parole, did you sign anything to say that

1  you wouldn't break those rules?

2  A     When I got on parole?

3  Q     Yeah.

4  A     Yes.  And I admitted to violating them.

5  Q     Say that again.

6  A     And I admitted to violating them.

7  Q     So when you went on parole initially, when you got out of

8  prison, you said I won't drink alcohol, I won't be around kids,

9  I won't go to Chuck E. Cheese, right?

10  A    I didn't say I would go to Chuck E. Cheese.  What are you

11  -- what are you --

12  Q     You know what I mean.  You said that in the video.  You

13  said you can't go to Chuck E. Cheese.  You said that in --

14  A     Oh, I see what you're saying.  Yes.  Yes.  I -- I agreed

15  to the stipulations.

16  Q     And did you abide by that in 2015?

17  A     At that time, no.

18  Q     All right.  So we lied in college to a cop.  We lied under

19  oath to a state judge in Corpus Christi.  We lied to our parole

20  officer about what we would and would not do in 2015.  Correct?

21  A     Yes.

22  Q     But you're telling the truth here today.  Right?

23  A     Yes.

24  Q     How tall are you?

25  A     Five-five.

1  Q    Five foot, five inches?

2  A    Yes.

3  Q    Do you know how tall Victim-1 [redacted] is?

4  A    No.  About four -- four-something.

5  Q    Four-something, right?  How much money did you make at

6  your job?

7  A    I made between $1,200 to $1,400 a week.

8  Q    Okay.  So that works out to about $4,800 to what is that,

9  somebody do the math for me, 50-something, $5,000-something.

10 Between $4,800 and $5,000-something per month, correct?

11 A    About, yeah, somewhere around there.  After taxes, after

12 medical insurance, after all the -- after all the deductions I

13 made about between four and five, yeah.

14 Q    Between $4,000 and $5,000.

15 A    Uh-huh (affirmative).

16 Q    Can we say $4,500, roughly?

17 A    Roughly.

18 Q    Does that sound about right?

19 A    It sounds about right.

20 Q    That's your take-home?

21 A    That's my take-home.

22 Q    Did you have a mortgage?

23 A    Yes.

24 Q    How much was it?

25 A    My mortgage, it was $116 -- no, $1,016 per month.

1  Q    Did you have any other bills?  Did you have the car

2  payment?

3  A    Yes.

4  Q    How much was that?

5  A    It was $200 and something.  $240 to 60 bi -- bi-monthly.

6  Q    Twice a month?

7  A    Twice a month.

8  Q    So $400 and something a month?

9  A    Yes.

10  Q    Did you have any other bills?

11  A    Utilities.

12  Q    At the end of the month, out of that $4,500, how much do

13  you normally have left?

14  A    Let's see here.  At least a good maybe couple thousand.

15  Q    You had a couple of thousand at the end of the month?

16  A    Somewhere around there.

17  Q    You paid $1,000 for your mortgage, $500, $400 to $500 for

18  your car out of that $4,500.  There's $1,500 gone right there,

19  right?

20  A    Yes.  My bills weren't very much.  Gas was only about $20-

21  something, maybe $19.  Water wasn't very much.  I was never

22  home.  I was always working.  And so the only thing that was

23  really running in my house would be refrigerator, air

24  conditioning.

25  Q    Any other significant bills?

1  A    Insurance.

2  Q    How much was that?

3  A    That was about maybe -- it was really cheap.  It was only

4  about $100 and something per month from what I remember.  And I

5  don't remember how much my -- my housing -- my house insurance

6  was, either.  That came right out of my -- my bank account.

7  Q    Okay.  And you -- speaking of your bank account, your bank

8  was Complex Credit Union, right?

9  A    Yes.  Complex Community Credit Union.

10 Q    Right.  And that's -- there's a few different branches of

11 that, right?  It's not just one?

12 A    There's a few branches.

13 Q    And you would sometimes go to the one there on the south

14 Wal-Mart -- by the south Wal-Mart on Big Spring, right?

15 A    Sometimes.

16 Q    And that's the one at 310 Longview.  Does that sound about

17 right?

18 A    Yeah.

19 Q    Yes?

20 A    Yeah.

21 Q    And you'd go there to make ATM withdrawals sometimes.  Is

22 that right?

23 A    Yes.

24 Q    And you saw Chris Villa here in the courtroom yesterday,

25 earlier today, correct?

1    A    Yes.

2    Q    So you know him, right?

3    A    Yes.

4    Q    You had him in your phone as a contact that you would text

5    sometimes?

6    A    Yes.

7    Q    And you know a guy named Henry in your phone as well,

8    correct?

9    A    Which one?

10    Q    Well, do you have more than one Henry in your phone?

11    A    There's more than one Henry.

12    Q    Okay.  And you know a guy named Isaiah Chavez (phonetic)

13    in your phone too, correct?

14    A    Yes.

15    Q    And you know Norma who testified earlier, correct?

16    A    Yes.

17    Q    In fact, you had her in your phone as Normita (phonetic).

18    Isn't that right?

19    A    Yes.

20    Q    And you've been to your pastor's house to watch football

21    before, correct?

22    A    Yes.

23    Q    And you've been to the Los Caporales Mexican restaurant in

24    Odessa before, correct?

25    A    Yes.

1  Q    And you've been to Martinez Bakery in Midland, correct?

2  A    Yes.

3  Q    You've been to the Chili's in Odessa, Texas, correct?

4  A    Yes.

5  Q    And you've searched for BMX bikes on your phone, correct?

6  A    Yes.

7  Q    And did you do that with Victim-1 [redacted] or did

8  Victim-1 [redacted] do that by himself?

9  A    We -- I -- we both did it.

10 Q    You did it together?

11 A    Yes.  The idea -- the idea came up.  I asked him one time,

12 so what are you saving for next.  And he said he wanted a bike.

13 So we started basically window shopping on the phone.  And

14 that's basically just to get an idea of what they would look

15 like, what color -- what -- what -- what kind of bike are you

16 interested.  But nothing was purchased on that day.

17 Q    And you saw the videos of Victim-1 [redacted] washing your

18 car, correct?

19 A    Yes.

20 Q    And that was you taking a video of him, correct?

21 A    Yes.

22 Q    That's your voice we hear on that video, correct?

23 A    Yes.

24 Q    And that's him in there saying something about how can't

25 believe you normally pay $16 for a car wash, correct?

1 A    Yes.

2 Q    And the search warrant photos we saw, that's all of your

3 house, correct?

4 A    Yes.

5 Q    The living room pictures we saw, that's your living room,

6 right?

7 A    Yes.

8 Q    The hoverboard box and cart that was in there, that's the

9 one that you bought for Victim-1 [redacted], correct?

10 A    Yes.  I kept it.

11 Q    And the gumball machine that he testified to that you all

12 got at Chuck E. Cheese, that's all true, correct?

13 A    What's -- what part of it is true, that it's there or that

14 it's -- that it's his or mine?  I didn't understand.

15 Q    Tell us.  What's true?

16 A    Well, it's -- it's in my office.  It's mine.  It's my --

17 it's my bubblegum machine, but we did get it together.

18 Q    Where did you get it?

19 A    At Chuck E. Cheese.

20 Q    That personal lubricant in your dresser, in your end table

21 there, night stand, that's yours, correct?

22 A    That is mine.

23 Q    You are, in fact, a sex offender.  Correct?

24 A    Yes.  I'm a registered sex offender.

25 Q    You took those pictures of that sex offender sign in

1  Exhibit 16.1 through 16.4, correct?

2  A    Yes.

3  Q    The web history showing you logging into the PeopleNet for

4  your company that you worked for, Permian Services, that's you

5  logging into your work, right?

6  A    Yes.

7  Q    The paying the bills, Vivint and water bill and all that,

8  that's you using your phone to pay bills, correct?

9  A    Yes.

10  Q    The pictures inside Peyton's Bikes, that's pictures you

11  took, correct?

12  A    Yes.

13  Q    The Chuck E. Cheese receipt found on your person, that was

14  from when you took Victim-1 [redacted] to Chuck E. Cheese,

15  correct?

16  A    Yes.

17  Q    The messages with you and Normita, Norma, that's you

18  texting her, correct?

19  A    Yes.

20  Q    That's you texting Chris Villa on your phone, correct?

21  A    Yes.

22  Q    That's you texting Victim-1's [redacted] dad and mom on

23  the Victim-1's [redacted] contact, Victim-1's [redacted]

24  parents and sometimes Victim-1 [redacted] contact on your

25  phone, correct?

1  A    Yes.

2  Q    That's you texting a picture of yourself to some guy off

3  of Craigslist, right?

4  A    Yes.

5  Q    That's you texting a picture of your penis to that guy on

6  Craigslist, correct?

7  A    Yes.

8  Q    That's you using Telegram to search to be part of all

9  those groups, right?

10 A    Yes.

11 Q    That's you searching for all different things about feet,

12 correct?

13 A    Oh, yes.

14 Q    That's you in the search terms in Exhibit 10 typing in

15 those words and searching on your phone, correct?

16 A    The -- which one was Exhibit 10?  Was that the titles?

17 Q    I'll show you some in a second.  In fact, let's do that.

18 A    Will I be able to see it here?

19 Q    Those are the -- some of the pictures that we saw of,

20 like, the collector Barbies.  That's your stuff, right?

21 A    Yes.  Those are my daughter's.

22 Q    Okay.  How old's your daughter?

23 A    Twenty.

24 Q    Where is she?

25 A    She lives in Sinton, Texas.  I started accumulating those

1  when I was in the military around -- around 2000, maybe 2003.
2  And she -- she hadn't been born yet, but we were collecting
3  them because we always wanted a girl.  They are collector
4  items, still in the box.  And they are -- they are very
5  detailed.

6      They're ethnically correct such as -- the -- the
7  collection is called Barbies of the World.  And a Cambodian has
8  Cambodian facial features, Cambodian dress, Cambodian even the
9  box itself is -- is decorative.  And they are -- they are
10  collector's items.  I have about 30 of them.
11  Q    But they're yours, right?
12  A    They're not mine.  They're my daughter's.  I'm -- I'm
13  holding them for her so that when she eventually has a child of
14  her own or -- or we reconnect, that I will give them to them.
15  But they are collector items, and they are -- they are -- they
16  are worth something.  And it's -- it's the only thing I have of
17  her.
18  Q    Did you say reconnect?
19  A    Reconnect.
20  Q    When was the last time you talked to her?
21  A    The last time I talked to her was the day of my arrest,
22  May 22nd, 2005.
23  Q    How old was she then?
24  A    Four.
25  Q    And those pictures of Hot Wheels and things, those are

1  yours too, right?

2  A     The -- I didn't see the pictures of the Hot Wheels.

3  Q     You heard some testimony about it, right?

4  A     I don't remember the testimony of the Hot Wheels.  But I

5  do have Hot Wheels that are collectibles.  And they are -- a

6  lot of them are on a board, and they're all Volkswagen.  And --

7  and then I have others that are there for when people come over

8  and they do have children, they have something to keep them

9  occupied with as well as other toys while we are associating

10 and they're -- so they don't interrupt or get bored or whatever

11 it is that they do.  They have -- I have a box there so that

12 they can keep occupied.

13 Q     So you keep those other ones for other kids, that your

14 collectors are on the wall.  The other ones for kids are

15 somewhere else?

16 A     Yes.

17 Q     Okay.  Like that one?

18 A     Yes.

19 Q     What are those feet?

20 A     Those are -- those are imitation feet.  They -- I use them

21 for Halloween decorations.  And they're also heavy enough to be

22 bookends.  But they're in a box.

23 Q     You like feet, don't you?

24 A     Yes.  I have a foot fetish.

25 Q     That's why we saw all those feet search terms, right?

1  A    Yes.

2  Q    And that's why you were massaging Victim-3 [redacted]'s

3  feet, right?

4  A    I never massaged Victim-3 [redacted]'s feet.

5  Q    Did you ever search porn on your TV?

6  A    Yes, I've searched porn on my TV.

7  Q    This is your TV, correct, 1.244 showing?

8  A    Yes.  Yes.

9  Q    So you've searched for teen porn, correct?

10 A    Yes.  Teen porn, 18 and over.

11 Q    Only ever searched for 18 and over stuff, right?

12 A    On TV, yes.

13 Q    Did you search for under 18 on something else?

14 A    I searched for younger -- younger people feet, not porn.

15 Q    So I'm now showing Government's Exhibit 10 in evidence,

16 specifically Page 15 of 22.  So which of these search terms are

17 yours, and which are not?

18 A    They're mine.

19 Q    My apologies.  I skipped out of that.  So on September

20 23rd, that was you searching young boy porn, right?

21 A    Young boy porn is not -- is not child porn.  It's young 18

22 porn.  It doesn't say that, but I search 18 and over porn.

23 It's adult porn where it's --

24 Q    Oh.

25 A    Uh-huh (affirmative).

1  Q    So Mr. Ali's testimony, his forensic search just failed to

2  uncover the fact that you added young boy porn, but don't give

3  me under 18?

4  A    No.  That is the intent was 18 and over.  Even though it

5  says young, it's 18 and over.

6  Q    That was in your mind, what you were thinking over 18?

7  A    Yeah.

8  Q    So when you were thinking I want porn of over 18-year-

9  olds, you thought I'll type young boy?

10  A    Yes.  According to the -- the sites that I am on Pornhub,

11  they only have 18-year-old porn.  And if you want younger

12  looking, then you would type in young.

13  Q    Young, young?

14  A    No, just young boy porn.  It's a search.  And -- and if it

15  pops up, it pops up.  And that's what you -- that's what you

16  see.  If it's something you did not want, you just click off.

17  Q    What is the difference between young boy porn and boy

18  porn?

19  A    There's not much -- there's -- according to when you type

20  it in, it will -- the difference is is what comes up.  And like

21  I said, it's not my choice what comes up, but it's not -- I'm

22  not looking at child porn.  I'm looking for young man porn.

23  Q    Would you like me to Google young boy porn right now, see

24  what comes up?

25  A    See what comes up.  And you will get a list.  And it's up

1  to you to choose which one you want because that's how Google

2  works.

3  Q    Oh, okay.  So you're saying that maybe some child porn

4  might get returned?  And you just wouldn't click that.

5  A    No, the -- the option for child porn may get returned.

6  But it would be up to you to click on it and -- and see either

7  what's on it and get off of it, or -- or for you to watch it.

8  But that's the way it works with -- with Google.  You get a

9  list of what the things you type in.  Type in barbeques and

10 you'll get a list of barbeques and places to go.

11 Q    Okay.  So if you clicked on a link and the name of the

12 page that was returned was children porn videos, then that

13 would be one that you selected and went to, correct?

14 A    No.  That would be -- that would be access to one.  It's

15 like a door.  You can either go in, or you don't have to.  You

16 basically would walk away or one would go into it.

17 Q    But this is saying you went in it.

18 A    Where?

19 Q    This is your Google Chrome history in Exhibit 9.

20 A    No, those are -- those are -- those are -- from what I

21 understood from what Mr. Ali said, that was -- that was the

22 things that popped up -- oh, wait.  I'm maybe on the wrong

23 page.  Let's see here.  Let me find it.  Oh, those are things

24 that -- those are things that came up, from what I understand.

25 Q    So you think this list is the response page when you enter

1  a search string, not the pages you clicked on and actually

2  looked at.  Is that what you're saying?

3  A    Right, because I don't ever remember clicking on new LST

4  33.  I don't -- I don't know how -- why anybody would ever type

5  that in there.  That's not a -- that's not like a request.  And

6  even the -- even the thing, underground galleries, I would not

7  type in.  Those are -- I think those are -- those are the

8  things that are -- that pop up when you type something in.

9  Q    I'm showing now 8.256.

10  A    Uh-huh (affirmative).

11  Q    Is that you in there?

12  A    That is me sitting there.

13  Q    What are you holding?

14  A    I'm holding my phone.

15  Q    Same phone we're talking about in this case?

16  A    Yes.

17  Q    Who are you looking at and talking to?

18  A    I'm talking to Victim-1 [redacted].

19  Q    What shirt is he wearing?

20  A    He isn't wearing one.

21  Q    Why?

22  A    He came over and he was smoking.  And he took his shirt

23  off so that he wouldn't smell like smoke.

24  Q    Whose idea was that?

25  A    That was his idea.  I don't have cigarettes.  I don't

1  smoke cigarettes.

2  Q    So you let an 11-year-old boy smoke in your house?

3  A    No.  He's smoking outside my house.  And that was --

4  that's him.  I mean, I talked to him during that time.  I said

5  hey, do your parents know this.  Do you -- is it a -- you know,

6  what -- what are you doing with cigarettes.  And he chose to

7  smoke.

8  Q    What's Victim-1 [redacted] drinking there?

9  A    He's drinking something.  I can't tell what it is.  It

10 looks digitally distorted.

11 Q    Do you remember that day?

12 A    No, not off the top of my head.  That was over a year ago.

13 Q    Over a year ago is too long to remember an 11-year-old

14 drinking alcohol in your side yard?

15 A    I didn't say it was alcohol.

16 Q    He did.

17 A    He did.  He did say it was alcohol.  But I had -- I had

18 energy drinks that he would drink.  I had juice that he would

19 drink, Body Armor, and that was it.  I've never given Victim-1

20 [redacted] alcohol.

21 Q    Well, you didn't give him a cigarette either, according to

22 you.

23 A    No, I didn't.  I don't have cigarettes in my house.  I

24 don't smoke.

25 Q    So maybe he brought over a six-pack of Truly as well.

1  A    No, he's not drinking that.  I don't -- I don't believe

2  that's Truly.  And you can't tell it's a Truly.  It's very

3  distorted.  Is there any way you can zoom on it closer because

4  it doesn't look like -- it just looks like something, but it

5  doesn't look like a specific drink.

6  Q    But you're confident he's smoking a cigarette, right?

7  A    I'm confident he was smoking a cigarette.  I saw him smoke

8  a cigarette.

9  Q    But you're unsure of whether he was drinking alcohol in

10 your presence?

11 A    I'm not unsure.  I know he wasn't drinking alcohol.

12 Q    Oh, so that's where you draw the line?

13 A    What?  What line?  You asked me if I'm sure he was

14 drinking -- smoking a cigarette.  And I am sure he was smoking

15 a cigarette.  And then you asked me if I'm unsure of him

16 drinking alcohol.  And I'm telling you no, I am not unsure.  I

17 am definitely know he was not drinking alcohol.  Not at my

18 house.

19 Q    That's your moral code?

20 A    No, I don't -- I didn't say anything about a moral code.

21 I'm saying I'm definite he wasn't drinking alcohol at my house.

22 Q    Would you have let him?

23 A    No.  I'm not going to let him drink alcohol at my house.

24 Q    Why?

25 A    Why?  Because he doesn't have any business drinking

1 alcohol at my house.

2 Q    Because he's 11, right?

3 A    Well, because he's 11.  Not only that, but he's -- yeah.

4 Well, yeah.  He's 11.

5 Q    That wouldn't be right, would it?

6 A    No.

7 Q    But you let him smoke a cigarette?

8 A    I talked to him about it.  And I said hey, what are you

9 doing.  Do your parents know about this.  And he continued to

10 do so.  He took off his shirt so that he wouldn't smell like

11 smoke.  And I'm not going to sit there and make him or -- or

12 have an argument with him.  But that's between him and his

13 parents.

14      And I'm sure -- I'm sure if they knew he smoked, he would

15 come home and smell like smoke.  They smoke.  I don't have

16 cigarettes at my house.  I didn't give it to him.

17 Q    So what would be the suspicion then if he went home

18 smelling like smoke if he lives in a house where people smoke?

19 A    Exactly.  I figured that's between them and their family.

20 That's -- that's -- that's his thing.

21 Q    So you weren't interested in being an honest man and

22 telling Victim-1's [redacted] dad, hey, Victim-1's [redacted]

23 headed down a bad path.  He's smoking cigarettes.  We should

24 probably have a talk about that.  You didn't think to do that?

25 A    No.  They smoke, and -- and that's -- that's between him

1  and -- and Victim-1 [redacted].  If Victim-1 [redacted] wants

2  to tell him that he smokes, well then that's between him.  But

3  he did not drink alcohol at my house.

4  Q    Because my goodness, that's where you draw the line,

5  right?

6  A    No, that's not what I'm saying.  I'm saying he did not,

7  and that's all I'm saying is that I'm not saying there's a

8  moral code, there's lying or anything like that.  I'm just

9  saying on that picture, that's not -- that cannot be alcohol

10 because I don't let him drink alcohol at my house.

11 Q    Mr. Renteria, if you would please read that, what you see

12 on the screen.

13 A    It says mm.  No, I'm watching the time.  Okay, but I

14 won't.  Okay, okay, I'll stop it.

15 Q    Sorry, I had a hard time hearing you.  Could you slow

16 down?  Start again.

17 A    No, I'm watching the TV.  Okay.  But I won't.  Okay, okay,

18 I'll stop it.

19 Q    It didn't say TV, did it?

20 A    Time.

21 Q    Can you try that again?

22 A    No.  I'm watching the time.  Okay, but I won't.  Okay,

23 okay.  I'll stop it.

24 Q    What were you talking about when you said that on the

25 video?

1  A    What video?  The --

2  Q    Are you serious?

3  A    Well you just asked me what was -- when you said something

4  on the video.  What video are you saying that I said that on?

5  Are you -- are you referring to the video in question as far as

6  the evidence?  Or what -- what exactly?

7  Q    Yes.

8  A    It wasn't me who said that.

9  Q    Who was it?

10 A    That's -- that's exactly what -- why there should be a

11 more complete investigation I think is that I know it wasn't

12 me.  And it can only be two of other people that -- that I know

13 of.  And that's it.

14 Q    Tell me who those people are.

15 A    One of them is Chris Villa.  And the other one was a 16-

16 year-old boy named C.

17 Q    Those are the only two people it could be?

18 A    Well, I don't -- I don't expect it to be Victim-1's

19 [redacted] dad.

20 Q    Okay.  That's generous.  Why do you think it's Chris

21 Villa?

22 A    Because it's not me.  If it was me, I would say it was me.

23 But it's not.  And so it can only be -- it could only be the

24 other two -- how can I put this -- sexually mature males in --

25 who were there.

1  Q    Did Chris spend a lot of time in your house without his
2  pants on?
3  A    No.
4  Q    Have you ever known him to be in your house without his
5  pants on?
6  A    No.
7  Q    Have you ever known him to sit on your couch without his
8  pants on?
9  A    No.
10 Q    And that video was in your house, right?  Like, you
11 acknowledge that, correct?
12 A    I acknowledge that that is my house.  And that is my
13 living room.
14 Q    That's your living room, that's your house, that's your
15 phone, correct?
16 A    That's my phone.
17 Q    But it's not your penis we see in there?
18 A    That is not my penis we saw.  We saw an image of my penis,
19 and it was -- it was different in character, different in --
20 different in size, different in shape.  It was not my penis.
21 Q    And that's not your voice we hear?
22 A    That is not my voice.  Those were not my words.
23 Q    Just one more second.  Just one last topic.  When your
24 attorney was asking you questions, you said look, I don't know
25 why Victim-1 [redacted] would lie.  I'm not going to call a

1 child a liar.  You remember that?

2 A    Yes.  I remember that.

3 Q    So you're not calling Victim-1 [redacted] a liar, right?

4 A    I'm not -- I'm not going to get into that he -- finger

5 pointing in here.  I just want to know -- I just -- I just

6 replied I'm not going to -- I'm not going to argue in that way.

7 It's -- it's just all that.

8 Q    You're not going to get into finger pointing?

9 A    Well, not with an 11-year-old in court.  I'm not going to

10 sit there and -- and argue with him.  Yeah, I'm sure he has his

11 reasons to lie or he's -- he's 11.  Or at the time he was 11.

12 And so that's -- that's something that would be with him.  I

13 can't answer for him lying.  I can't -- or the reasons why he

14 would lie.

15 Q    So he's 12 now, right?

16 A    Yeah, he should be 12.

17 Q    Is that too old for you?

18 A    As far as what?

19 Q    Your sexual interest.

20 A    That's too young for me.

21 Q    So when he made this hand gesture, said that you did this,

22 that was a lie, right?

23 A    I've never seen that hand gesture.

24 Q    And when Victim-3 [redacted] said you did this, that was a

25 lie, right?

1 A    I've never done that.

2 Q    And when Victim-3 [redacted] said you set a timer on a

3 microwave in 2005, or offered to time him, that was a lie,

4 correct?

5 A    It was not true.

6 Q    And when Victim-1 [redacted] said it 15 years later that

7 you set a timer on your phone, that was a lie, right?

8 A    That was not true, either.

9 Q    Has your playbook changed at all in 15 years?

10 A    I'm sorry, did what change?

11 Q    Has your playbook for molesting kids changed at all in 15

12 years?

13 A    There is no playbook.

14 Q    You're just winging it?

15 A    No.  That's ridiculous.

16         MR. BERRY:  Pass the witness.

17         THE COURT:  Redirect?

18         MR. COLTON:  No questions, Your Honor.

19     (Witness excused)

20         THE COURT:  Thank you.

21         Ladies and gentlemen, let's take a short break.  I'll

22 ask you to leave your notebooks here.  We'll come right back.

23 It will take, just take ten minutes maximum.  Whenever you're

24 ready, we'll be ready.  I've got to talk to the attorneys about

25 a few things for scheduling.  Sort of always the way it is

right as we get closer to the end of the trial.  You have to come and go a little bit more, and I apologize for that.

You'll leave your notebooks here.  You remember your instructions.  And we'll have you back here shortly.  Let's rise for the jury, please.

(Jury out at 9:48 a.m.)

THE COURT:  All right.  Let's have a seat, please. And outside the presence of the jury.  Marshal, go ahead and re-chain -- however you want to do it.

THE BAILIFF:  He can go over there first.

THE COURT:  All right.

THE BAILIFF:  We can get him --

THE COURT:  Okay, thank you.  Mr. Colton, when we bring the jury back in, do you have another witness?

MR. COLTON:  No, Your Honor.

THE COURT:  You plan --

MR. COLTON:  We rest.

THE COURT:  You plan to rest.  Okay.  So I'll bring them in.  I'll call on you for your next witness.  You're welcome to rest.  Let's take five -- yes,    Mr. Ogden?

MR. OGDEN:  Your Honor, because we're resting, just so we don't have to do it in front of the jury, we renew the Rule 29.

THE COURT:  You want to take that up now?

MR. OGDEN:  As long as we're outside the presence,

1  Your Honor, to --

2          THE COURT:  Okay.  Yes, sir.

3          MR. OGDEN:  Just that we'd renew the same Rule 29.

4          THE COURT:  The Court, in reviewing the evidence in a

5  light most favorable to the Government, taking all inferences

6  in favor of the Government, and resolving all issues of

7  credibility in favor of the Government, which is the standard

8  of proof required on a Rule 29 motion at this time, finds that

9  a reasonable and rational juror could find the Defendant guilty

10 beyond a reasonable doubt of each of the elements set forth in

11 the indictment in all four counts, and respectfully denies the

12 motion.

13         So let's take five minutes.  And then if you have any

14 rebuttal witnesses, we'll have those ready to go pretty

15 quickly, Government.  And then we'll wrap up.  Thank you, all.

16      (Recess at 9:50 a.m./Reconvened at 9:59 a.m.)

17      (Outside the presence of the jury, defendant present)

18         THE COURT:  All right.  We're back on the record.

19 Mr. Villa has rejoined us.  All the attorneys -- I'm sorry,

20 Mr. Renteria has joined us.  Mr. Villa's joined us only because

21 he's about to be I think called as a witness possibly.  I'll

22 tell you what, why don't you go ahead and have a seat over

23 there on the wall, Mr. Villa, because the Defense hasn't rested

24 yet.

25         Mr. Berry, outside the presence of the jury?

1          MR. BERRY:  Yes, Your Honor.  As you know, Mr. Villa

2   is about to be called to testify in the Government's rebuttal

3   case.  He has some criminal history that are misdemeanors only,

4   and they are not crimes of dishonesty.  I have provided that

5   criminal history to the Defense and asked them, I don't think

6   they can use any of that against him in his cross.  But if they

7   plan to, I would ask them to please approach and let us do that

8   on the side.  And I just wanted that on the record.

9          THE COURT:  Which attorney's going to cross?

10         MR. COLTON:  I will, Your Honor.

11         THE COURT:  Mr. Colton, you understand?

12         MR. COLTON:  Yeah.  Yeah.  It's mostly DWIs.  There's

13  a deadly conduct, but I don't think it's relevant.

14         THE COURT:  Okay.  Thank you.  If you ever determine

15  that it is, just approach and we'll discuss it.  I trust you

16  implicitly.

17         MR. COLTON:  Yes, Your Honor.

18         THE COURT:  All right.  Very well.  Okay.  Are we

19  ready now?  Mr. Berry, did you have anything else you wanted to

20  take up outside the presence?

21         MR. BERRY:  No.  No, Your Honor.  I just need to do

22  a --

23         THE COURT:  Okay.

24         MR. BERRY:  -- quick swap-out thing because we're

25  going to --

1          THE COURT:  Okay.  Go ahead and do that.  And I'll

2    let you retake your place.

3          MR. BERRY:  Sure, Judge.

4          THE COURT:  We'll bring them in.

5          THE CLERK:  Are we ready?

6          MR. BERRY:  Just one second.

7          THE COURT:  That's all right.

8          MR. BERRY:  I want to do a test.  I apologize.

9          THE COURT:  I want you to be ready.  I'd rather spend

10   the time now than later.

11         MR. BERRY:  Okay.

12         THE COURT:  All right.  You want to take that off?

13         MR. BERRY:  Yeah, sorry.  All right.  I think I'm

14   ready.

15         THE COURT:  Now I think we're ready.  Bring in the

16   jurors.  Rise for the jury, please.

17      (Jury in at 10:03 a.m.)

18         THE COURT:  Let's be seated, please.  Thank you.

19         Mr. Colton, your next witness?  Or Mr. Ogden, your

20   next witness?

21         MR. OGDEN:  Just to be clear, Defense rests, renews

22   that motion.

23         THE COURT:  Yes, sir.  Same ruling.

24         MR. OGDEN:  Thank you, Your Honor.

25         THE COURT:  The Defense having rested, Mr. Berry, are

 1  there -- do you have any rebuttal witnesses?

 2              MR. BERRY:  Your Honor, the United States calls one

 3  rebuttal witness, Chris Villa.

 4              THE COURT:  Mr. Villa, if you would raise your right

 5  hand, please, and be sworn.

 6          CHRISTOPHER VILLA, GOVERNMENT'S WITNESS, SWORN

 7              THE COURT:  You go ahead and have a seat.  And then

 8  if you -- if you feel comfortable you can remove your face

 9  covering so to make sure we understand you.

10              THE WITNESS:  Yes, Your Honor.

11              THE COURT:  Thank you.  Mr. Berry, you may proceed

12  whenever you're ready, sir.

13              DIRECT EXAMINATION OF CHRISTOPHER VILLA

14  BY MR. BERRY:

15  Q    Good morning, Mr. Villa.

16  A    Good morning.

17  Q    Thank you for being here.  When did we first meet?

18  A    Yesterday.

19  Q    Do you know why you're here?

20  A    Yes, sir.

21  Q    Do you know Martin Renteria?

22  A    Yes, I do.

23  Q    You see him in the courtroom today?

24  A    He's wearing a white mask and grey suit with white --

25  Q    You said white mask, and then what?

1  A    Grey -- grey jacket and white shirt.

2  Q    Thank you.

3        MR. BERRY:  Will the record please reflect that the

4  witness has identified the Defendant?

5        THE COURT:  The record shall so reflect.

6  BY MR. BERRY:

7  Q    How do you know him?

8  A    I met him through a mutual friend of ours that used to

9  work with him.

10 Q    How long have you known him?

11 A    2018.

12 Q    2018?

13 A    Yes.

14 Q    You didn't know him back in 2015?

15 A    No.

16 Q    You didn't know him back in 2005?

17 A    No.

18 Q    Okay.  Do you have a sexual interest in children,

19 Mr. Villa?

20 A    No, I don't.

21 Q    Have you ever inappropriately touched a child of any age

22 below the age of 18?

23 A    No, I haven't.

24 Q    You sure of that?

25 A    Yes, sir.

1  Q    You know Victim-1 [redacted]?

2  A    Yes, I do.

3  Q    Do you see him in the courtroom?

4  A    Yes, I do.

5  Q    Do you see his dad?

6  A    Yes, I do.

7  Q    Do you know them?

8  A    Yes, I do.

9  Q    Did you sexually assault Victim-1 [redacted]?

10 A    No, I didn't.

11 Q    Did you touch him inappropriately in any way?

12 A    No, I didn't.

13 Q    Have you ever taken your pants off in the Defendant's

14 living room?

15 A    No, I haven't.

16 Q    You ever exposed your penis at all in the Defendant's

17 house?

18 A    No, I haven't.

19 Q    Have you ever used the Defendant's phone to take a picture

20 of your penis?

21 A    No, I haven't.

22 Q    Have you ever used the Defendant's phone to take a video

23 of you sexually assaulting Victim-1 [redacted]?

24 A    No, I haven't.

25 Q    I'm now going to show you Government's Exhibit 6.1,

1  already in evidence.  It's 12 seconds long.  It will not come

2  up on your screen.  You're only going to see it over here.  And

3  at the end of that, I'll ask you some questions.  Okay?  Do you

4  understand?

5  A     Yes.

6        (Audio played from 10:07 a.m. to 10:07 a.m.)

7  BY MR. BERRY:

8  Q     Was that you on that video?

9  A     No, it's not.

10 Q     Do you recognize where it takes place?

11 A     It looks like -- it looks like Martin's TV room.

12 Q     Okay.  Are those your shoes?

13 A     No, they're not.

14 Q     Are you sure?

15 A     I'm sure.

16 Q     You're absolutely sure?

17 A     I'm absolutely sure.

18 Q     You didn't touch that boy?

19 A     I did not touch that boy.

20 Q     You didn't have him touch you?

21 A     I did not have him touch me.

22 Q     How does it feel to be accused of this?

23 A     Disgusted, shocked.  Hard to put into words.  I don't see

24 how somebody could do that.

25            MR. BERRY:  Pass the witness.

1          THE COURT:  Mr. Colton?

2          MR. COLTON:  No questions, Your Honor.

3          THE COURT:  Thank you, sir.  You can step down.

4    Thank you very much for being here.

5        (Witness excused)

6          THE COURT:  Mr. Berry, any other witnesses?

7          MR. BERRY:  United States closes.

8          THE COURT:  Mr. Colton?

9          MR. COLTON:  We would close, Your Honor.

10          THE COURT:  All right.

11          Ladies and gentlemen of the jury, the parties have

12   closed their cases.  So that means a couple things.  It means

13   that you've now received everything you're going to receive for

14   this case.  You've got all the evidence.  But you've not been

15   given the case to deliberate yet.  All right?

16          In a little while I'm going to have you take a break.

17   It's going to be a little bit longer one because we have to

18   make clear what we want, what everybody agrees to or disagrees

19   with putting into Court's instructions to the jury because I've

20   got to give you the instructions, the Court's charge.

21          When you come back in here, I'm going to read that to

22   you.  It's quite lengthy.  I'm required to read it, although I

23   know you all know how to read.  You probably read audibly

24   better than I do, but you get to test my skills because I have

25   to read it to you.

1    And you'll have a copy of it at the time.  It'll be
2  your copy.  So if you make notes on it, that's okay.  You can
3  take that into the jury room with you when you retire to
4  deliberate.  You don't have to take notes.  You don't have to
5  read along.  You can set it aside and just listen.  Or you can,
6  like I say, read along.

7    And I'll read it to you.  Once I'm done reading that,
8  the jury -- the instructions that the Court's charged to the
9  jury, the attorneys will have an opportunity to give their
10 summations, their arguments.  As opposed to that opening
11 statement where they weren't arguing but just kind of giving
12 you a roadmap of what they expected the evidence to be, this is
13 actual argument.  The Government, by reason of having the
14 burden of proof as we've talked about before and as you'll read
15 more of in the charge, they have the right to open as well as
16 give a final rebuttal, or closing of the closing.

17    And so typically, you have the Government will argue,
18 they'll open with a full argument.  There will be Defense
19 argument, and then the Government gets to rebut their argument
20 because the Government -- the Defense has already had an
21 opportunity to rebut the Government's argument.

22    They each have the same amount of time.  And I'll be
23 keeping a clock on them, and I'll be telling them when we're
24 stopping and starting, and when they're getting close, that
25 sort of thing.  And at that point, then you'll take the case

1  and retire to deliberate.

2  So we're going to need a little time. And we got to
3  make copies once we agree on everything. We're pretty close
4  already. Once we agree on everything, we got to then get it --
5  get it copied so that when you come back in here, you're going
6  to have not only your notebooks in your chair which you're
7  going to leave here, you're going to have a copy of the charge.
8  All right?

9  So you'll pick that up as you sit down, or before you
10 sit down. And then I'll start off by just reading the charge
11 to you. All right? So I'm going to say it's probably going to
12 be 20 to 30 minutes. So take a nice long break, stick around
13 there in the jury room if you would.

14 And we've got, I guess, beverages and snacks. But
15 we'll do it as quickly as we can. If we can get it done
16 quicker than that, we'll be back here quicker than that. All
17 right? It takes a little time to get it done. And we want to
18 make sure we get it right.

19 With that, let's rise for the jury. And we'll see
20 you -- we'll let you know in about 20 to 30 minutes. Thank
21 y'all.

22  (Jury out at 10:12 a.m.)

23  THE COURT: Please be seated.

24  All right. So, Ms. Means has handed to you the
25 Court's proposed instructions to the jury. I want to hit a

1 couple of highlights. You all are very familiar with this.

2 You've had most of this for a week or so now. And then we've

3 made a few changes just overnight.

4     In fact, I had copies for you yesterday afternoon,

5 and then the Defendant decided to testify so we've changed all

6 that. So that's been changed as far as the Defendant's

7 testimony, testifying. Now it'll be in there that he's to be

8 treated like every other witness, of course.

9     And then the only other thing that I saw that jumped

10 out at me, over on Page 5. And I'm going to give you all a few

11 minutes here in a minute just to kind of go back through it.

12 You got a lot of boilerplate up front, and so I know that won't

13 take you a lot of time.

14     On Page 5 it says impeachment by prior conviction.

15 That's the Stepmother of Victim-1 [redacted] prior. I recall

16 testimony of a misdemeanor for Ms. Madrid, a hot check or

17 something or a theft by check.

18     MS. BOVE: That's correct, Your Honor.

19     THE COURT: Okay. And I just leave it to the parties

20 whether or not you want to include that. We did not. We can.

21 It doesn't matter. It doesn't matter to the Court.

22     Defense?

23     MR. OGDEN: I guess we'd prefer it to be in there,

24 Your Honor.

25     THE COURT: Okay. Do we know what that was?

1          MR. COLTON:  Except they never addressed it with her
2    I don't think as an impeachment issue.
3          THE COURT:  I think the Government brought it up.
4    The Government brought it up, right?  I mean it's not --
5          MR. OGDEN:  As all good directs do, they buffered it.
6    Yes, they were the ones who addressed it.
7          THE COURT:  Well, they didn't buffer Stepmother of
8    Victim-1's [redacted].  Are you saying that was a poor direct?
9    No, I'm just kidding.  I'm just kidding.
10         MS. BOVE:  (Indiscernible).
11         MR. OGDEN:  No, I have a poor memory though, Judge.
12   I'll tell you that.
13         THE COURT:  No.
14         MR. COLTON:  Do we also need to put it in for the
15   Defendant then?
16         THE COURT:  Yeah.  Well, let's get to that in a
17   minute because there are other issues with that.
18         MR. OGDEN:  And, Your Honor, before I forget, all
19   evidence is closed.  I have to renew that Rule 29.
20         THE COURT:  Right.  And for the same reasons, and the
21   Court overrules the Rule 29 motion --
22         MR. OGDEN:  Thank you, Judge.
23         THE COURT:  -- for the same reasons stated.
24         So remind me, on Norma Madrid, it was a -- what
25   exactly was the charge?

1          MS. BOVE:  Your Honor, the charge was -- I believe

2   the charge was a hot check under $500.  And her testimony was

3   that she took steps to get it expunged in order to get a notary

4   license with Roy Scott.  And she ended up getting that notary

5   license.

6          MR. COLTON:  I think it's technically a theft by

7   check less than $500.

8          THE COURT:  Theft by check.

9          MR. COLTON:  Misdemeanor.

10          THE COURT:  And so you're saying she's testified that

11   it was expunged?

12          MS. BOVE:  I don't know if that came out, but I know

13   that line of questioning was there.

14          MR. OGDEN:  I do remember that, Your Honor.  I don't

15   know the law about expungements in impeachment.  I have to

16   confess.  So I don't know if that's appropriate or not.

17          THE COURT:  Well regardless, I just don't remember it

18   being talked about being expunged.  I didn't hear that.  I

19   could be --

20          MR. OGDEN:  I do think she needed it to get the

21   notary license or --

22          THE COURT:  Okay.

23          MR. OGDEN:  -- something to that effect.

24          THE COURT:  We can add that.  Let's make sure, talk

25   to Ms. Means and make sure we have that in there.  If that

matters to the jury, they've heard it.  We'll instruct them on that.

So then let's talk about the Defendant's prior convictions.  We've got -- we've got it on Page 6:

"You've heard evidence that Defendant allegedly engaged in other conduct which is similar to the acts charged in the indictment.  You may consider this evidence for its bearing on any matter to which you believe is relevant.

"However, evidence of other alleged acts on their own is not sufficient to prove the Defendant guilty of the crimes charged in the indictment.  Bear in mind as you consider this evidence at all times, the Government has the burden of proofing that Defendant committed each of the elements of the offenses charged in the indictment.

"Of course, the fact that the Defendant may have previously committed an act similar to the one charged in this case does not mean that the Defendant necessarily committed the act charged in this case.

"Remember that you are here to decide whether the Government has proved beyond a reasonable doubt that the Defendant's guilty of the crimes charged in this case.  The Defendant's not on trial for any act, conduct, or crime not charged in the indictment."

1          So we address it.  We don't address it like we
2   typically would for impeachment, under impeachment by prior
3   conviction.  You all think about that.
4        (Pause)
5          THE COURT:  You all think about that and look at the
6   rest of it.  I'll give you about ten minutes, and then I'll
7   come back and you all can tell me what you all want to do.
8          If you have anything else -- and that'll -- yes, sir?
9          MR. BERRY:  I'm going to make it simple.
10         THE COURT:  Okay.
11         MR. BERRY:  We don't need to have it listed in the
12  impeachment by conviction.  It says this is the --
13         THE COURT:  I agree.
14         MR. BERRY:  -- 414 instruction --
15         THE COURT:  Yeah.
16         MR. BERRY:  -- that we offered.  It's one paragraph
17  saying you can use it for its bearing on --
18         THE COURT:  Any purpose.
19         MR. BERRY:  -- any matter --
20         THE COURT:  That's right.
21         MR. BERRY:  -- to which it is relevant, you believe
22  is relevant.  And then we have three paragraphs saying but
23  don't use it only by itself.
24         THE COURT:  Which is -- exactly.  And I think to put
25  it in there again was going to be dangerous.

1          MR. BERRY:  And I just, I think it's fine as-is.  And

2     so we don't need to argue about it.  We're happy to concede

3     that it doesn't need to go in the impeachment by conviction

4     section.

5          THE COURT:  Defense agrees?

6          MR. OGDEN:  Yeah, Your Honor.  I think it's as best

7     as what we can come up with.  Those last paragraphs as a

8     curative instruction for all the '05 and 2015 things that came

9     in.

10          THE COURT:  Yes, sir.

11          MR. COLTON:  So I think it's the closest we can come

12     to a curative.

13          THE COURT:  I agree.  Okay.  So you all take 10

14     minutes.  I'll come back.  You're going to hit me with any

15     highlights you have that you want changed that you think are

16     omitted or shouldn't be in there.  Okay?  And I'll be back no

17     later than 10:30.  And we got our clock fixed.

18          THE BAILIFF:  All rise.

19     (Recess at 10:19 a.m./Reconvened at 10:33 a.m.)

20     (Outside the presence of the jury; defendant present)

21          THE COURT:  All right.  Outside the presence of the

22     jury, we're back in court.  Mr. Renteria's here as well, of

23     course.  Mr. Berry, I don't know who's going to -- if anybody

24     wants to argue.  Are you happy with the charge, or do you have

25     changes you'd like?

1        MR. BERRY:  We had a few things that I would like to
2   discuss.

3        THE COURT:  Okay.

4        MR. BERRY:  Starting on Page 12.

5        THE COURT:  Page 12.  Yes, sir.

6        MR. BERRY:  Under the Count 2.

7        THE COURT:  Make sure that mic's on you.  If you'll
8   pull it towards you.  I just want to make sure we get it all.

9        MR. BERRY:  Under the Count 2.

10       THE COURT:  Yes, sir.

11       MR. BERRY:  The way we alleged it in the indictment
12  was that the felony offense that was committed was really just
13  Count 1.  It's listed here as Count 1 and 4, and I think that's
14  because we might have erroneously submitted an instruction to
15  that effect.  But we have asked Ms. Means to remove the or
16  Count 4 in the first paragraph under Count 2, and then in the
17  first element, the or sex trafficked a minor in 1591.  We think
18  that we should probably remove that because of the way the
19  indictment reads.

20       THE COURT:  Okay.  So let me back up.  So that should
21  read Title 18 United States Code Section 2260(a) makes it a
22  crime to commit a felony offence involving a minor while being
23  required to register as a sex offender.  You should only
24  consider this count if you find the Defendant is guilty of
25  Count 1?

1          MR. BERRY:  Correct.

2          THE COURT:  If you find the Defendant is not guilty

3     of Count 1?

4          MR. BERRY:  Of all of Count 1, I guess.  I don't know

5     if you want to get rid of the of all of.  I don't really know

6     what that means.

7          THE COURT:  Is that a pattern?  Of all of?  Of all of

8     Count 1?

9          UNIDENTIFIED VOICE:  There is --

10         MR. BERRY:  Maybe all of the element -- yeah.  I

11    think it's got to say not guilty of the count because it's

12    beyond a reasonable doubt as to each element, not guilty to the

13    totality.

14         THE COURT:  So what are we agreeing on?

15         MR. BERRY:  I mean, I don't want to be pedantic, but

16    I would get rid of, of all of Count 1.  I would just say if you

17    find the Defendant is not guilty of Count 1, then --

18         THE COURT:  Okay.

19         MR. BERRY:  -- you should also find --

20         THE COURT:  That's what I was going to do.  Good.

21    That works.  Then you should find Defendant's not guilty of

22    this count.  For you to find the Defendant guilty of Count 2,

23    you must be convinced that the Government has proved each of

24    the following beyond a reasonable doubt.  First, that the

25    Defendant produced child pornography in violation of Title 18

of the United States Code Section 2251A as charged in Count 1.
Second, right?

MR. BERRY:  Correct.

THE COURT:  That at the time the Defendant committed
a felony offense involving a minor by either producing child --
by producing child pornography as charged in Count 1 he was
required to register as a sex offender.

MR. BERRY:  Correct.

THE COURT:  All right.

MR. BERRY:  And then the next line?

THE COURT:  If you find the Defendant guilty on Count
1 -- well we just threw it all in there, didn't we -- then the
first element of the offense has been established.

MR. BERRY:  Correct.

THE COURT:  And is that?  That's it, I think.

MR. BERRY:  That's it on that.

THE COURT:  Mr. Ogden, any objection to that?

MR. OGDEN:  No objection to taking out charges here.

THE COURT:  Okay.

MR. OGDEN:  My only question, I think as we know
there's not a pattern instruction for this.

THE COURT:  Right.

MR. OGDEN:  The way that reads sort of suggests that
as a matter of law, the offense in the first element involves a
minor.  As I read the statute, that would kind of render the

involving the minor surplusage.  So I would think there would
have to be an extra element that says such offense involved a
minor because it --

THE COURT:  Okay.

MR. OGDEN:  The statute reads something to the akin
of, you know, it involves a minor under these titles, he was
required to register as a sex offender.

THE COURT:  So you're saying say Title 18 of the
United States Code Section 2260(A) makes it a crime to commit a
felony offense while being required to register as a sex
offender?

MR. OGDEN:  No, no, no.  I think that part's right.
I think that part, makes it a felony offense, commit a felony
offense involving a minor while being required to register as a
sex offender, I think that's correct.  It's just that the --
there's not going to be any elements that involves a minor.

THE COURT:  We're still on Page 12, Count 2, right?

MR. OGDEN:  Correct, Your Honor.

THE COURT:  So what would you add, Mr. Ogden, or what
would you take out?  Tell --

MR. OGDEN:  I would say I would add --

THE COURT:  A third element?

MR. OGDEN:  A third element that says and such
offense involved a minor.

THE COURT:  Okay.  So that's already -- that's

1  already in there in Count 1 on Page 10.  First, that the

2  Defendant employed, used, persuaded, induced, enticed, or

3  coerced a minor to engage in sexually explicit conduct.  So

4  it's already taken care of.

5      MR. BERRY:  Here's why that doesn't make sense.  2260

6  --

7      THE COURT:  Right.

8      MR. BERRY:  -- says --

9      THE COURT:  Right.

10     MR. BERRY:  -- you only get 10 extra years if you're

11 required to register as a sex offender and you commit a list of

12 these enumerated offenses.  And then it lists it involving a

13 minor in 2251(a), necessarily involves a minor.  So for them to

14 find Count 1, they must have already concluded that the child

15 was under the age of 18.

16     THE COURT:  Right.

17     MR. BERRY:  It's redundant to ask them --

18     THE COURT:  So --

19     MR. BERRY:  -- was it a minor --

20     THE COURT:  I agree with that, Mr. Ogden.  I'm not

21 going to -- I'll --

22     MR. OGDEN:  Okay.  Thank you, Judge.

23     THE COURT:  I'm not going to include that.

24     MR. OGDEN:  On Count --

25     THE COURT:  And so --

1          MR. OGDEN:  On Count 2 --

2          THE COURT:  Hang on.  Hang on a second.

3          MR. OGDEN:  I apologize.

4          THE COURT:  Are we still on Count 2?

5          MR. OGDEN:  Yes, Judge.

6          THE COURT:  Okay.  Go ahead.

7          MR. OGDEN:  The last paragraph there I instruct you

8  that aggravated sexual assault of a child that that sentence

9  there.

10          THE COURT:  Yes, sir.

11          MR. OGDEN:  I'm not sure that's a legal question.

12  The Government has been, I think, proving the sex offender

13  thing as sort of as an apprendi matter that would have to go

14  before the jury.  So I'm also not sure it's true as a matter of

15  law that he be required to register for life.  And we heard

16  testimony that's the case in this specific case.

17          THE COURT:  Okay.  So all this week while you've had

18  this, have you submitted anything to Ms. Means?

19          MR. OGDEN:  No, Your Honor.  These were just --

20          THE COURT:  All right.  Go ahead.

21          MR. OGDEN:  -- deletions, not additions.

22          MR. BERRY:  I'm going to make this easy.  We can

23  delete it, Judge.  I don't think we have to instruct the jury

24  on this.  The Defendant admitted that he's a sex offender.  I'm

25  not worried about --

1          THE COURT:  Okay.

2          MR. BERRY:  -- a legal instruction telling them that.

3          THE COURT:  So considering the surpluses then, it

4  will say a defendant's required to register if he is a sex

5  offender under Texas law.  Sex offender is a person who has

6  been convicted of a qualifying sex offense.  Right?  And we're

7  going to take out I instruct you.  We're going to take out the

8  rest of that paragraph, which is the rest of that sentence.

9          MR. OGDEN:  Thank you, Your Honor, because I think

10  that's --

11          THE COURT:  Is that right?  Is that where we're

12  going?

13          MR. OGDEN:  Okay.

14          THE COURT:  That's what we'll do there.  Mr. Berry,

15  I'm back to you.  What other issues do you have?  And I'll take

16  Mr. Ogden as he has issues with those, with your issues.  And

17  then he may have some of his own.

18          MR. BERRY:  So if you would turn to Page 14, Your

19  Honor.

20          THE COURT:  Yes, sir.

21          MR. BERRY:  So now we're under Count 3 on the

22  elements.

23          THE COURT:  Right.

24          MR. BERRY:  At the very bottom, right above Count 4,

25  it says the term production includes copying or downloading

visual depictions from another source.  That is a correct

statement of the law.  I find this somewhat confusing because

in the elements themselves, we never use the word production.

And again, this is being a little bit pedantic.  We

say produced and we say producing.  And then down at the bottom

we say the term production includes.  I am concerned that a

juror will look at that and try to go back and find that word

and say well it doesn't say production anywhere.

So I would advise, I would recommend and advocate for

changing the term, I would say the terms produced or producing,

or and producing includes copying, downloading, whatever.  And

that that would be also an accurate statement of the law, and

more consistent with the verbiage used above.

THE COURT:  You say the term producing?

MR. BERRY:  The terms produced and producing because

you say produced in the second paragraph of the second element,

and we say producing in the third element.  But we never say

the word production.

THE COURT:  Mr. Ogden?

MR. BERRY:  For Count 3.

MR. OGDEN:  I think that's fine.  I'm sort of

confused by it myself.  But that's fine.

THE COURT:  Yeah, yeah.  No, I get it.  I get it.  So

we're going to say in that last sentence under Count 4, Page --

I'm sorry, above Count 4, Page 14, the terms produced and

producing include copying or downloading visual depictions from another source.

MR. BERRY: Correct, Your Honor.

THE COURT: Okay.

MR. BERRY: Thank you.

THE COURT: Thank you.

MR. BERRY: I realize it's a small thing, but --

THE COURT: That's all right.

MR. BERRY: -- it's one of those things that I think jurors get hung up on sometimes.

THE COURT: All right. What's next, Mr. Berry?

MR. BERRY: I don't think we have anything else. We're good with everything else, Judge, including the special interrogatory.

THE COURT: Okay. Mr. Ogden, do you have anything?

MR. OGDEN: Your Honor, just a couple things I think we would argue for deletion, I suppose.

THE COURT: Okay.

MR. OGDEN: On Page 10, Count 1, the "in deciding" paragraph.

THE COURT: Okay. Hang on. Okay. "In deciding whether the Government" -- okay, go ahead.

MR. OGDEN: I went through the pattern instruction. I might have missed it. I don't know if that's in there. If it is, it's the standard instruction. I just didn't see it.

1 I'm not sure where that paragraph comes from.

2 THE COURT:  They come from the pattern?

3 MR. BERRY:  What are we talking about?

4 MR. OGDEN:  Page 10, the "in deciding" paragraph.

5 MR. BERRY:  What are you -- what's the discrepancy

6 with it?

7 MR. OGDEN:  Well, I'm just not sure where that comes

8 from or if that's the pattern.

9 MR. BERRY:  It's not the pattern.

10 (Pause)

11 MS. BOVE:  Your Honor, if I could.  I believe the

12 paragraph we're referring to was submitted by the Government.

13 When you first provided jury instructions, you provided our

14 suggestions.  And the next draft was provided to Counsel, and

15 that's what we're referring to there.

16 THE COURT:  (Indiscernible).

17 MS. BOVE:  It is not, Your Honor.

18 THE COURT:  So, Mr. Ogden, when you look at this "in

19 deciding whether the Government has proven that the" -- do you

20 disagree with this?

21 MR. OGDEN:  I'm not sure.  In the pattern

22 instructions, there's a case McGee (phonetic) that what it

23 sounds like the summary is is that a jury has to decide whether

24 there is sufficient evidence to draw the inference between the

25 production and the solicitation, something to that effect.  I'm

1  not sure this accurately states what the law --

2       THE COURT:  Okay.  So here's what I'm going to do.

3  I'm going to take a five-minute break.  I want you to submit in

4  writing what you want, not do this orally like this.

5       MR. OGDEN:  Okay.

6       THE COURT:  This is why I gave you a week to be

7  working with Ms. Means, feeding her information.  We do like

8  this, we don't like this, we're going to object to this, we're

9  not going to object to this.  We like this, we want this

10 omitted.  That's just too easy.  This is too difficult.

11      So, Mr. Ogden, write that out so that we'll have what

12 you want.  It will also preserve your objection if I disagree

13 with it.

14      MR. OGDEN:  Your Honor, all I'm arguing for is

15 deletion of it.

16      THE COURT:  Deletion of what?

17      MR. OGDEN:  The whole in deciding paragraph.

18      THE COURT:  The whole paragraph?

19      MR. OGDEN:  Yes.  That's the part that doesn't appear

20 in the 5th Circuit instructions.

21      THE COURT:  Okay.  But you said instead, there's

22 something else that --

23      MR. OGDEN:  No, no, no.  I don't think the jury needs

24 to be instructed on anything else.  I think it's a common

25 enough parlance.

1            THE COURT:  Right.  So you want -- let me back up.

2    You want after first, second, and third, you want to go to the

3    term computer means an electronic magnetic, that?

4            MR. OGDEN:  I believe that's how the 5th pattern

5    instructions are.  It might be in a different --

6            THE COURT:  All right.  So, Ms. Means.  What's your

7    next?

8            MR. OGDEN:  Your Honor, we would -- the Court's

9    already ruled on this.  And it -- Count 4 is the pattern

10   instruction.  So I think the Court's already ruled on this.  I

11   think the affecting interstate commerce misstates Lopez.  I

12   think it should say substantial.  It's the pattern instruction.

13   I believe the Court's already ruled on that.  So I just wanted

14   that to be clear for the record.

15           THE COURT:  Thank you.

16           MR. OGDEN:  I don't think we've ever --

17           THE COURT:  Hang on.  Mr. Berry, you disagree with

18   him on that, right?

19           MR. BERRY:  I'm not even sure what the argument is

20   right now.

21           THE COURT:  The argument is that it should state on

22   Count 4 over on Page 16, right, Mr. Ogden?

23           MR. OGDEN:  I believe I have --

24           THE COURT:  15?

25           MR. OGDEN:  Oh, no, no, no.  I see where you're

1  looking.  Yes, Your Honor.  Well, it cross-references --

2           THE COURT:  It does.

3           MR. OGDEN:  -- the previous.

4           THE COURT:  Yeah, it does.

5           MR. OGDEN:  It is what it is.  I just don't think the

6  pattern ones incorporate Lopez in the correct way.

7           THE COURT:  I see.  But the pattern's there.  So I

8  overrule that request.

9           MR. OGDEN:  Thank you, Judge.  On the consent thing,

10 I don't think anybody's ever argued that.  I think --

11          THE COURT:  Wait, wait, wait.  Where are we on

12 consent thing?

13          MR. OGDEN:  I apologize.  Page 19.

14          THE COURT:  Consent is not an offense.  A minor's

15 willingness to engage in sexual activity is irrelevant because

16 by law, a minor is unable to consent to sexual activity.

17          MR. OGDEN:  That's certainly true.  I just don't

18 think we've -- it would be very disingenuous if we had ever

19 argued anything like that.

20          THE COURT:  I see.

21          MR. OGDEN:  I don't think we did.

22          MR. BERRY:  I think it should stay in, Your Honor.

23 We asked the Veneer (phonetic) panel about whether they could

24 follow the law with regards to that, and the Defense asked him

25 whether he was scared of the Defendant, which is an insinuation

1  when he says it wasn't until something happened, or until that
2  happened.
3          But the very questions suggest to them hey, I mean,
4  you're not scared of this guy.  Like,, you did this willingly.
5  You consented to all this.  What's the big deal.
6          THE COURT:  I took it that way, as well.  But let me
7  -- do either of you have authority for me, any case law?
8          MR. OGDEN:  Just to be clear, Your Honor, we
9  certainly did not mean it that way.  I think that --
10         THE COURT:  That is the way -- I mean, I'll just
11 frankly, honestly tell you that's the way I took it.  I thought
12 okay, this is where we're going.
13         MR. OGDEN:  But just to --
14         THE COURT:  But then after that, you left it alone.
15 I guess there's not a lot more you can do with that.
16         MR. OGDEN:  Well, I thought of it as an argument by
17 inference that if he wasn't afraid, there wasn't a reason to be
18 afraid.  I didn't think of that as consent.  But --
19         THE COURT:  All right.  Well, I'll overrule the
20 objection to the consent is not a defense.  That one sentence,
21 we'll leave that in.
22         MR. OGDEN:  And, Your Honor, lastly on Page 16, the
23 cell phone as a faculty of interstate commerce facility.
24         THE COURT:  Let's go back.  16.  At the bottom of the
25 page?

1          MR. OGDEN:  Yes, Your Honor.  Again, last thing here.

2 To me that's -- I believe that is a pattern instruction, if I'm

3 --

4          MR. BERRY:  It comes from a Fifth Circuit case called

5 U.S. v. Runyan, Your Honor.

6          THE COURT:  Can we get a cite?  Do you have a cite?

7          MR. BERRY:  I got the name.  I don't have the cite

8 off the top of my head, Judge.

9          THE COURT:  You've got the style but not the cite?

10 We'll find it.  Ms. Means will find it.

11          MR. BERRY:  I'll pull you U.S. v. Runyan.

12          THE COURT:  Okay.  That's pretty good.  But it rhymes

13 with bunyan, so it's easy to remember, right?

14          MR. BERRY:  Yeah, something like that.  It's because

15 I've cited it to this Court many times over the last decade.

16          THE COURT:  So that's at 290 F.3d 223.  That's a 2002

17 case.  And there are also pattern instructions.  So I'll

18 overrule the objection, or the request to remove that,

19 Mr. Ogden.

20          MR. OGDEN:  Thank you, Your Honor.  And that's all I

21 have.  I apologize for --

22          THE COURT:  No.

23          MR. OGDEN:  -- doing this --

24          THE COURT:  It's all good.

25          MR. OGDEN:  -- now.

1      THE COURT:  No, it's all right.  My intentions were

2  not clearly defined, I'm sure.  So as to back to Page 10, the

3  Court will remove this paragraph.  I'll grant that request and

4  objection by the Defense.  We'll stick with merely the pattern.

5  The Government is certainly entitled to argue the case how they

6  want to argue it.  And I'll remove --

7      MR. BERRY:  And just to be -- I'm sorry.

8      THE COURT:  I'm sorry.  Yeah, go ahead.

9      MR. BERRY:  And just to be clear on 10, this is the

10  additional language that we submitted regarding for the purpose

11  of the Defense has specifically requested that that be removed.

12  Correct?

13      THE COURT:  Where it says in deciding?

14      MR. BERRY:  Yeah.

15      THE COURT:  Whether the Government, that entire

16  paragraph?

17      MR. OGDEN:  Correct.  I did -- I know he's trying to

18  make this clear for the record.  I -- yes, we are requesting

19  the removal of that paragraph like the Court was --

20      THE COURT:  That's exactly -- oh, I'm sorry.  I

21  didn't realize what you were saying.

22      MR. BERRY:  That's all I want in the record, Judge.

23      THE COURT:  That's exactly right.  It's granting

24  their objection and -- to that language, and their request to

25  have it removed.  I'm granting it and removing it.

1          Now, Mr. Berry, with that, is the Government happy?

2          MR. BERRY:  Yes.

3          THE COURT:  I want everybody to be happy.  Mr. Ogden,

4    you're happy with that, knowing with the objections and all

5    that?

6          MR. BERRY:  Sure.

7          MR. OGDEN:  Generally speaking or with --

8          MR. BERRY:  In life or in love?  Yes.

9          THE COURT:  The charge.

10         MR. OGDEN:  We have nothing further on that, Judge.

11         THE COURT:  Okay.  I appreciate the humor.  All

12   right.  So, now, can we go make copies of that?  Do you need me

13   to help you with that one?

14         THE CLERK:  Yeah.

15         THE COURT:  Because I can tell you exactly what I

16   want.

17     (Pause)

18         THE COURT:  Okay.  So she's going to go make copies

19   for everybody.  One change that I'm making to what we talked

20   about a moment ago, Mr. Berry, on Page 14, it'll say on that

21   right above Count 4 where it says -- it's now going to say the

22   term produced includes copying or downloading visual depictions

23   from another source.

24         We've already defined producing on Page, my Page 12.

25   It's at the bottom of Count 1 above Count 2.  The term

producing means producing, directing, manufacturing, issuing, publishing, or advertising. I don't want to define producing two different ways in the same charge.

MR. BERRY: Okay.

THE COURT: So that's what we'll do there. If anybody wants to point to that in argument, you're welcome to. I just don't think we should --

MR. BERRY: I'm not going to belabor it, Judge.

THE COURT: Putting any inconstancy in there. Well, all right. So, Mr. Berry, who's arguing for the Government?

MR. BERRY: Alicia will, Ms. Bove will be arguing first. We would like 40 minutes divided 30 and 10. And I will be arguing rebuttal.

THE COURT: Mr. Colton, what's the Defense? Mr. Velasquez, you're going to argue the whole time?

MR. VELASQUEZ: Yes, Your Honor.

THE COURT: Okay. You don't want to split it up at all?

MR. VELASQUEZ: No.

THE COURT: And you're 40? Forty is good for you?

MR. VELASQUEZ: Yeah, that's plenty.

THE COURT: With 40, I'll give you a five-minute warning for you, Mr. Velasquez. And I'll give you a two. And I'll give you a countdown from 15 seconds. But we all know how we do this here. We -- when I say stop, we stop. Not another

syllable.  It would be unfair to Mr. Fedock who's the one

person I've had to cut off mid-syllable ever, if I allowed

anybody to do that.  It would be unfair to each other, as well.

And that's plenty of time.

Ms. Bove, how much on that?  You're 30 minutes.  You

want, how much of a warning do you want?  Two minutes, three

minutes, five minutes?

MS. BOVE:  No strong feelings on that, Your Honor.

MR. BERRY:  Two minutes.

THE COURT:  Two?  And, Mr. Berry?

MR. BERRY:  Two.

THE COURT:  Two.  You got it.  All right.  Very good.

MR. BERRY:  And just to be clear, remind us, Your

Honor, and Ms. Bove, help me remember the way you do the

counting.  If we don't use -- if she doesn't use all of her 30,

explain that again.

THE COURT:  It's pretty simple.  So actually, you

look at it as the whole is 40, right?  You got to use half of

your time or you start losing ground because you're opening,

and they have to have an opportunity to rebut.  And if you're

not going to give them an opportunity to rebut, we're going to

take time away.

So once you're past 20, then there's nothing more to

worry about.  If you stop short, then he gets two minutes less,

or one minute less, or whatever it is.  Does that make sense?

1          MS. BOVE:  It does.

2          THE COURT:  Okay.  That way it's fair, so you have an

3   opportunity to rebut their opening.  That's what an old judge

4   used to call fully opening.  And I just, I told him one time, I

5   said Judge, I don't understand what that means.  I kind of

6   think I do.  But I don't really know.  So that's what I try to

7   do.  I picked that up from another judge or two.  And so we

8   require the Government to do their at last half.

9          I have seen once or twice, I wasn't involved in the

10  trial, I have seen once or twice where the Government sat down

11  after about two minutes of a 45-minute argument.  And there's

12  just nothing to rebut there.  So that would be pretty silly

13  anyway.

14         MS. BOVE:  That will not be the case.

15         THE COURT:  All right.  Now, if you take -- if you go

16  past your 30, I don't --

17         MS. BOVE:  I mean, it --

18         THE COURT:  -- get the hook for you because you're

19  the opening.  I get the hook for these two guys.  But --

20         MR. BERRY:  No worries.

21         THE COURT:  -- you're taking time from Mr. Berry.  So

22  he may be pretty upset.

23         MS. BOVE:  Understood, Your Honor.

24         THE COURT:  Okay.  All right.  So this will take us a

25  good 10 minutes I think to make these copies.  And then we'll

1  come back and do that.  Thank you all.

2      (Recess at 10:59 a.m./Reconvened at 11:17 a.m.)

3      (Outside the presence of the jury, defendant present)

4          THE COURT:  All right.  We're ready.  We think we're

5  ready.  Mr. Berry, anything from the Government?  Any issues?

6          MR. BERRY:  No, sir.

7          THE COURT:  Mr. Colton, any issues from the Defense?

8          MR. COLTON:  I don't believe so, Your Honor.

9          THE COURT:  All right.  We're all here outside the

10 presence.  Mr. Renteria is here.  We're going to bring the jury

11 in and argue this case.  Let's rise for the jury.

12     (Jury in at 11:19 a.m.)

13         THE COURT:  Thank you.  Please be seated.  You should

14 have in your chair a copy of the Court's instructions to the

15 jury.

16         Members of the jury, in any jury trial there are in

17 effect two judges.  I'm one of the judges.  The other is the

18 jury.  It's my duty to preside over the trial and to decide

19 what evidence is proper for your consideration.  And it's also

20 my duty at the end of the trial to explain to you the rules of

21 law that you must follow, and apply, in arriving at your

22 verdict.

23         First, I'll give you some general instructions which

24 apply in every case, for example instructions about burden of

25 proof and how to judge the believability of witnesses.  Then

I'll give you some specific rules of law about this particular case. And finally, I'll explain to you the procedures you should follow in your deliberations.

You as jurors are the judges of the facts. But in determining what actually happened, that is in reaching your decision as to the facts, it is your sworn duty to follow all of the rules of law as I explain them to you. You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you.

You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It's your duty to apply the law as I explain it to you, regardless of the consequences. It's also your duty to base your verdict solely upon the evidence without prejudice or sympathy.

You're to decide this case only on the evidence which has been admitted into court during trial. That was the promise you made and the oath you took before being accepted by the parties as jurors. And they have the right to expect nothing less.

The indictment, or formal charges, against the Defendant are not evidence of guilt. Indeed, the Defendant is presumed by the law to be innocent. The Defendant begins with a clean slate. The law does not require the Defendant to prove his innocense or produce any evidence at all. The Government

has the burden of proving the Defendant guilty beyond a reasonable doubt.  And if it fails to do so, you must acquit the Defendant.

While the Government's burden of proof is a strict or heavy burden, it is not necessary that the Defendant's guilt be proved beyond all possible doubt.  It's only required that the Government's proof exclude any reasonable doubt concerning the Defendant's guilt.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.  Proof beyond a reasonable doubt therefore is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions of your own affairs.

As I told you earlier, it is your duty to determine the facts.  To do so, you must consider only the evidence presented during the trial.  Evidence is the sworn testimony of the witnesses and the exhibits.  The questions, statements, objections, and arguments made by the lawyers are not evidence.

The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing, to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case.  What

1  the lawyers say is not binding upon you.

2         During the trial, I sustained objections to certain
3  questions.  You must disregard those questions entirely.  Do
4  not speculate as to what the witness would have said if
5  permitted to answer the question.  Your verdict must be based
6  solely on the legally admissible evidence and testimony.

7         Also, do not assume from anything I may have done or
8  said during the trial that I have any opinion concerning any of
9  the issues in this case.  Except for the instructions to you on
10 the law, you should disregard anything I may have said during
11 the trial in arriving at your own verdict.

12        In considering the evidence, you are permitted to
13 draw such reasonable inferences from the testimony and exhibits
14 as you feel are justified in the light of common experience.
15 In other words, you may make deductions and reach conclusions
16 that reason and common sense lead you to draw from the facts
17 which have been established by the evidence.

18        Do not be concerned about whether the evidence is
19 direct evidence or circumstantial evidence.  You should
20 consider and weigh all of the evidence that was presented to
21 you.  Direct evidence is the testimony of one who asserts
22 actual knowledge of a fact such as an eye witness.

23        Circumstantial evidence is proof of a chain of events
24 and circumstances indicating that something is or is not a
25 fact.  Law makes no distinction between the weight to be given

to either direct or circumstantial evidence. But the law requires that you, after weighing all of the evidence, whether direct or circumstantial, be convinced of the guilt of the Defendant beyond a reasonable doubt before you can find him guilty.

Certain charts and summaries of other records have been received into evidence. They should be considered like any other evidence in the case. You should give them only such weight as you think they deserve. The underlying records are the best evidence of what occurred.

I remind you that it is your job to decide whether the Government has proved the guilt of the Defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate. You're the sole judges of the credibility or believability of each witness and the weight to be given to each witnesses' testimony.

An important part of your job will be making judgments about the testimony of the witnesses, including the Defendant, who testified here, testified in this case. You should decide whether you believe all, some part, or none of what each person had to say, and how important that testimony was.

In making that decision, I'd suggest that you ask yourself some questions. Did the witness impress you as

honest.  Did the witness have any particular reason not to tell the truth.  Did the witness have a personal interest in the outcome of the case.  Did the witness have any relationship with either the Government or the Defense.  Did the witness seem to have a good memory.

Did the witness clearly see or hear the things about which he or she testified.  Did the witness have the opportunity and ability to understand the questions clearly and answer them directly.  Did the witness' testimony differ from the testimony of other witnesses.

These are the few of the considerations that will help you determine the accuracy of what each witness said.  The testimony of the Defendant should be weighed and its credibility evaluated in the same way as that of any other witness.  Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.

It making up your mind in reaching your verdict, do not make any decision simply because there were more witnesses on one side than on the other.  Do not reach your conclusion on a particular point just because there were more witnesses testifying for one side on that point.  You'll always bear in mind, and the law never imposes upon a Defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

1    You have been told that the witness, Stepmother of
2  Victim-1 [redacted], was convicted in 2017 of a drug offense.
3  And Norma Madrid was convicted of a misdemeanor theft by check
4  less than $500.  A conviction is a factor you may consider in
5  deciding whether to believe that witness, but it does not
6  necessarily destroy the witness' credibility.  It has been
7  brought to your attention only because you may wish to consider
8  it when you decide whether you believe the witnesses'
9  testimony.  It's not evidence of anything else.

10    During the trial, you heard the testimony of Gibran
11  Ali who expressed opinions concerning computer forensics and
12  child exploitation investigations, and the testimony of Jason
13  White concerning DNA evidence.  If scientific, technical, or
14  other specialized knowledge might assist the jury in
15  understanding the evidence, or in determining a fact in issue,
16  a witness qualified by knowledge, skill, experience, training,
17  or education may testify and state an opinion concerning such
18  matters.

19    Merely because such a witness has expressed an
20  opinion does not mean, however, that you must accept this
21  opinion.  You should judge such testimony like any other
22  testimony.  You may accept it or reject it and give it as much
23  weight as you think it deserves considering the witness'
24  education and experience, the soundness of the reasons given
25  for the opinion, and all the other -- all other evidence in the

1 case.

2       You've heard evidence that the Defendant allegedly
3 engaged in other conduct which was similar to the acts charged
4 in the indictment.  You may consider this evidence for its
5 bearing on any matter to which you believe is relevant.
6 However, evidence of other alleged acts on their own is not
7 sufficient to prove the Defendant guilty of the crimes charged
8 in the indictment.

9       Bear in mind as you consider this evidence at all
10 times the Government has the burden of proving the Defendant
11 committed each of the elements of the offenses charged in the
12 indictment.  Of course, the fact that the Defendant may have
13 previously committed an act similar to the one charged in this
14 case does not mean that the Defendant necessarily committed the
15 act charged in this case.

16       Remember that you are here to decide whether the
17 Government has proved beyond a reasonable doubt that the
18 Defendant is guilty of the crimes charged in the case.  The
19 Defendant is not on trial for any act, conduct, or crime not
20 charged in the indictment.

21       You're here to decide whether the Government has
22 proved beyond a reasonable doubt that the Defendant is guilty
23 of any of the crimes charged.  The Defendant is not on trial
24 for any act, conduct, or offense not alleged in the indictment.
25 Neither are you called upon to return a verdict as to the guilt

of any other person or persons not on trial as the Defendant in this case except as you are otherwise instructed.

If the Defendant is found guilty, it will my duty to decide what the punishment will be. You should not be concerned with punishment in any way. It should not enter your consideration or discussion. You'll note that the indictment charges that the offenses were committed on or about specify dates. The Government does not have to prove that the crimes were committed on those exact dates so long as the Government proves beyond a reasonable doubt that the Defendant committed the crimes on dates reasonably near October 4th, 2020, October 27th, 2020, and September 1st, 2020 through October 27th, 2020, the dates stated in the indictment.

A separate crime is charged in each count of the indictment. Each count and the evidence pertaining to it should be considered separately. The fact that you may find the Defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

The indictment contains multiple counts which read as follows: Count 1, that on or about October 4th, 2020, in the Western District of Texas, the Defendant Martin Renteria did employ, use, persuade, induce, entice, and coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct using materials that have been shipped, I'm sorry, mailed, shipped, and

transported in and affecting interstate and foreign commerce by any means including by computer in violation of Title 18 of the United States Code, Sections 2251(a), 2251(e), and 3559(e). Excuse me.

Count 2, that on or about October 4th, 2020, in the Western District of Texas, the Defendant Martin Renteria, an individual required by federal or other law to register as a sex offender committed a felony offense involving a minor under Title 18 United States Code Section 2251(a), all in violation of Title 18 United States Code Section 2260(a).

Count 3, that on or about October 27th, 2020, in the Western District of Texas, the Defendant Martin Renteria did knowingly possess a visual depiction of a prepubescent minor engaging in sexually explicit conduct which had been mailed, shipped, and transported in interstate and foreign commerce, was produced using materials which have been shipped and transported in interstate and foreign commerce, the production of which involved use of prepubescent minors engaging in sexually explicit conduct in violation of Title 18 United States Code Sections -- I'm sorry, Section -- yeah, Sections 2252(a)(4) and 18 U.S.C. Section 2252(b)(2).

Count 4, from on or about September 1st, 2020 through on or about October 27th, 2020, within the Western District of Texas in and affecting interstate commerce, the Defendant Martin Renteria did knowingly recruit, entice, harbor,

transport, provide, obtain, maintain, solicit, and patronize
Victim-1 [redacted], a person under the age of 14 years old,
having had a reasonable opportunity to observe Victim-1
[redacted], and in knowing and reckless disregard that Victim-1
[redacted] was under the age of 18 years of age, years old, and
knowing and in reckless disregard that Victim-1 [redacted]
would be caused to engage in a commercial sex act, and knowing
and in reckless disregard that force, threats of force, fraud,
and coercion, and any combination of such means would be used
to cause Victim-1 [redacted] to engage in a commercial sex act,
all in violation of Title 18 United States Code Sections
1591(a)(1), (b)(1), and (c).

Title 18 United States Code Section 2251(a) makes it
a crime to employ, use, persuade, induce, entice, and coerce
any minor to engage in sexually explicit conduct for the
purpose of producing a visual depiction of such conduct. For
you to find the Defendant guilty of Count 1, you must be
convinced that the Government has proved each of the following
beyond a reasonable doubt.

First, that the Defendant employed, used, persuaded,
induced, enticed, or coerced a minor to engage in sexually
explicit conduct. Second, that the Defendant acted with the
purpose of producing a visual depiction of such conduct. And
third, that the visual depiction was produced using materials
that have been mailed, shipped, or transported in or affecting

interstate or foreign commerce by any means, including by
computer.

The term computer means an electronic, magnetic,
optical, electrochemical, or other high-speed data processing
device performing logical, arithmetic, or storage functions and
includes any data storage facility or communication facility
directly related to or operating in conjunction with such
device, but such term does not include an automated typewriter
or typesetter, a portable hand-held calculator, or other
similar device.

Visual depiction includes undeveloped film and
videotape, data stored on computer disc or by electronic means
that is capable of conversion into a visual image, and data
that is capable of conversion into a visual image that has been
transmitted by any means, whether or not stored in a permanent
format.

The term minor means any person under the age of 18
years.  Sexually explicit conduct means actual or simulated
sexual intercourse including genital to genital, oral to
genital, anal to genital, or oral to anal whether between
persons of the same or opposite sex, bestiality, masturbation,
sadistic or masochistic abuse, or lascivious exhibition of the
genitals or pubic area of any person.

Be cautioned that not ever exposure of the genitals
or pubic area constitutes lascivious exhibition.  Whether a

visual depiction constitutes a lascivious exhibition requires a consideration of the overall content of the material.

You may consider such factors as: one, whether the focal point of the visual depiction is on the child's genitalia or pubic area; two, whether the setting of the depiction is sexually suggestive, that is in a place or pose associated with sexual activity; three, whether the child is depicted in an unnatural pose or inappropriate attire considering the age of the child; four, whether the child is fully or partially nude; five, whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and six, whether the depiction is designed to elicit a sexual response in the viewer. This list is not exhaustive, and no single factor is dispositive.

The term producing means producing, directing, manufacturing, issuing, publishing, or advertising. Interstate commerce means commerce or travel between one state, territory, or possession of the United States and another state, territory, or possession of the United States including the District of Columbia.

Foreign commerce means commerce or travel between any part of the United States including its territorial waters and any other country including its territorial waters.

Title 18 United States Code Section 2260(a) makes it a crime to commit a felony offense involving a minor while

being required to register as a sex offender.  You should only consider this count if you find the Defendant is guilty of Count 1.  If you find the Defendant is not guilty of Count 1, then you should also find the Defendant is not guilty of this count.

For you to find the Defendant guilty of Count 2, you must be convinced that the Government has proved each of the following beyond a reasonable doubt.  First that the Defendant produced child pornography in violation of Title 18 United States Code Section 2251(a) as charged in Count 1.  And second, that at the time the Defendant committed a felony offense involving a minor by producing child pornography as charged in Count 1, he was required to register as a sex offender by federal or state law.

If you find the Defendant guilty of Count 1, then the first element of this offense has been established.  A Defendant is required to register if he is a sex offender under Texas law.  A sex offender is a person who has been convicted of a qualifying sex offense.

Title 18 United States Code Section 2252(a)(4)(B) makes it a crime to knowingly possess matter that contains any visual depiction of a minor engaging in sexually explicit conduct that has been mailed, shipped, or transported using any means or facility of or in, or affecting interstate or foreign commerce, or which was produced using materials that had been

so mailed, shipped, or transported by any means including by computer.

For you to find the Defendant guilty of Count 3, you must be convinced that the Government has proved each of the following beyond a reasonable doubt. First, that the Defendant knowingly possessed one or more books, magazines, periodicals, films, videotapes, or other matters that contain any visual depiction of a minor engaging in sexually explicit conduct as alleged in the indictment.

Second, that the items were mailed, shipped, or transported using any means or facility of or in or affecting interstate or foreign commerce, or that the items were produced using material that had been mailed, shipped, or transported by any means of or in, or affecting interstate or foreign commerce, including by computer.

Third, that the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct. Fourth, that such visual depiction was of a minor engaging in sexually explicit conduct. And fifth, that the Defendant knew that such visual depiction was of such sexually explicit conduct, and that at least one of the persons engaged in sexually explicit conduct and such visual depiction was a minor.

The definitions of visual depiction, minor, sexually explicit conduct, interstate commerce, and foreign commerce

provided in Counts -- provided for in Counts 1 and 2 apply to Count 3, as well.  The term produced includes copying or downloading visual depictions from another source.

Title 18 United States Code Section 1591(a)(1) makes it a crime for anyone knowingly in or affecting interstate or foreign commerce to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit a person knowing or in reckless disregard for the fact that means of force, threats of force, fraud or coercion, or any combination would be used to cause such persons to engage in a commercial sex act, or knowing that the person was under the age of 18 would be caused to engage in a commercial sex act.

For you to find the Defendant guilty of Count 4, you must be convinced that the Government has proved all of the following beyond a reasonable doubt.  First, that the Defendant knowingly recruited, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited by any means Victim-1 [redacted].

Second, that the Defendant committed such act knowing or in reckless disregard of the fact that the person had not obtained the age of 18 years, and would be caused to engage in a commercial sex act.  And third, that the Defendant's acts were in or affected interstate or foreign commerce.

Commercial sex act means any sex act on account of which anything of value is given to or received by any person.

In determining whether the Defendant's conduct was in or affected interstate or foreign commerce, you may consider whether the Defendant used means or facilities of interstate commerce such as telephones, the internet, or hotels that serviced interstate travelers, or whether his conduct substantially affected interstate commerce by virtue of the fact that he purchased items to have moved in interstate commerce.

If the Government proves beyond a reasonable doubt that the Defendant had a reasonable opportunity to observe the person recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited, then the Government does not have to prove that the Defendant knew that the person had not obtained the age of 18 years.

Coercion means: A, threats of serious harm to or physical restraint against any person; B, any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or, C, the abuse or threatened abuse of law or the legal process, whether administrative, civil, or criminal in any manner, or for any purpose for which the law was not designed in order to exert pressure on another person to cause that person to take some action, or refrain from taking some action.

Serious harm means any harm, whether physical or non-

physical including psychological, financial, or reputational
harm that is sufficiently serious under all the surrounding
circumstances to compel a reasonable person of the same
background and in the same circumstances to perform or to
continue performing commercial sexual activity in order to
avoid incurring that harm.

The definitions of interstate commerce and foreign
commerce provided for in Counts 1 and 2 apply to Count 4, as
well. Commerce includes travel, trade, transportation, and
communication. Affecting commerce means that there is any
affect on -- I'm sorry, at all on interstate or foreign
commerce, however minimal.

A cellular telephone and the internet are both
facilities in interstate or foreign commerce. If you find for
example that a cellular phone was used to produce the visual
depiction in question, and that the cellular phone was
manufactured or of somewhere outside of Texas, then that is
sufficient to satisfy this element.

You have been instructed that your verdict, whether
it is guilty or not guilty, must be unanimous. The following
instruction applies to the unanimity requirement as to Count 4.
Count 4 of the indictment accuses the Defendant of committing
the crimes of sex trafficking in nine different ways.

The first is that the Defendant recruited. Second is
that the Defendant harbored. The third is that the Defendant

transported.  The fourth is that the Defendant provided.  The

fifth is that the Defendant obtained.  The sixth is that the

Defendant advertised.  The seventh is that the Defendant

maintained.  The eighth is that the Defendant patronized.  The

ninth is that the Defendant solicited.

The Government does not have to prove all of these

for you to return a guilty verdict on this charge.  Proof

beyond a reasonable doubt on one is enough.  But in order to

return a guilty verdict, all of you must agree that the same

one has been proved.  All of you must agree that the Government

proved beyond a reasonable doubt that the Defendant recruited,

or all of you must agree that the Government proved beyond a

reasonable doubt that the Defendant harbored, or all of you

must agree that the Government proved beyond a reasonable doubt

that the Defendant transported, or all of you must agree that

the Government proved beyond a reasonable doubt that the

Defendant provided, or all of you must agree that the

Government proved beyond a reasonable doubt that the Defendant

obtained, or all of you must agree that the Government proved

beyond a reasonable doubt that the Defendant advertised, or all

of you must agree that the Government proved beyond a

reasonable doubt that the Defendant maintained, or all of you

must agree that the Government proved beyond a reasonable doubt

that the Defendant patronized, or all of you must agree that

the Government proved beyond a reasonable doubt that the

1  Defendant solicited.

2        The word knowingly as that term has been used from
3  time to time in these instructions means that the act was done
4  voluntarily and intentionally, not because of mistake or
5  accident.  Possession as that term is used in these
6  instructions may be one of two kinds, actual possession or
7  constructive possession.

8        A person who knowingly has direct physical control
9  over a thing at a given time is in actual possession of it.  A
10 person who, although not in actual possession, knowingly has
11 both the power and the intention at a given time to exercise
12 dominion or control over a thing, either directly or through
13 another person or persons, is in constructive possession of it.

14       Possession may be sole or joint.  If one person alone
15 has actual or constructive possession of a thing, possession is
16 sole.  If two or more persons share actual or constructive
17 possession of a thing, possession is joint.  You may find that
18 the element of possession is present if you find beyond a
19 reasonable doubt that the Defendant had actual or constructive
20 possession, either alone or jointly with others.

21       It is reasonable to infer that a person ordinarily
22 intends the natural and probable consequences of his knowing
23 acts.  The jury may draw the inference that the accused
24 intended all of the consequences which one standing in like
25 circumstances, and possessing like knowledge should reasonably

have expected to result from any intention act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the Government has proved beyond a reasonable doubt that the Defendant possessed the required criminal intent.

A minor's willingness to engage in sexual activity is irrelevant because by law, a minor is unable to consent to sexual activity.

To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the indictment. You're deliberations will be secret. You will never have to explain your verdict to anyone. It is your duty to consult with one another and to deliberate in an effort to reach an agreement if you can do so.

Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During the deliberations, during your deliberations, you do not hesitate to reexamine your opinions, your own opinions, and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times, you are the judges of the facts. Your duty is to decide whether the Government has

proved the Defendant beyond a reasonable doubt.  When you go to the jury room, the first thing that you should do is select one of your number as your foreperson who will help to guide your deliberations, and will speak for you here in the courtroom.

The verdict form has been prepared for your convenience.  The foreperson will write the unanimous answer of the jury in the space provided for each count of the indictment, either guilty or not guilty.  At the conclusion of your deliberations, the foreperson should date and sign the verdict.

And so what you do not have on your -- with your copy is a copy of the verdict form.  When you go back into the jury room, Ms. Lerma's going to bring in the actual verdict form. There will only be one.  And this one is two pages.  About a page and a half.  And it says verdict form at the top.

It's really simple.  It says answer not guilty or guilty.  And then it says Count 1, we the jury find that Defendant Martin Renteria is, and there's a blank.  Underneath it says not guilty or guilty.  The foreperson will write the words not guilty or the word guilty into that blank, whichever the unanimous verdict of the jury is.  And then it says of the offense charged in Count 1 of the indictment.

Count 2 does the same thing.  We the jury find that Defendant Martin Renteria is blank, not guilty or guilty, of the offense charged in Count 2 of the indictment.  Count 3, we

the jury find that Defendant Martin Renteria is blank, not guilty or guilty, of the offense charged in Count 3 of the indictment. Count 4, we the jury find that Defendant Martin Renteria is blank, write in not guilty or guilty, of the offense charged in Count 4 of the indictment.

Again, not guilty or guilty is written in there by the foreperson, whatever the unanimous verdict of the jury is, whichever it is. And then there's a special interrogatory on the second and final page. If the Defendant -- if you find the Defendant Martin Renteria guilty of the crimes charged in Count 1 and/or Count 4, answer was or was not in this blank.

And it says we the jury unanimously agree by proof beyond a reasonable doubt that prior to committing the conduct charged in Counts 1 and/or 4, the Defendant Martin Renteria blank, write in. The foreperson writes in was or was not convicted of an offense in Nueces County, Texas, in which a minor under the age of 17 was a victim.

For the purpose of this question, convicted means that a court has sentenced the Defendant for the crime. And minor means an individual under the age of 17. So the word was or was not, whichever the unanimous decision of the jury is, if those two -- if either of those two counts were -- he was found guilty on those two counts.

Then the foreperson will date and sign the verdict form. Then the foreperson will take those two sheets of the

verdict form, place them in a large envelope. You're going to
have several large envelopes back there. Place it in a large
envelope and seal that envelope.

The foreperson then will keep hold of the envelope,
but will let the court security officer standing outside the
jury room door that the jury has reached a verdict. The CSO
will tell us, we'll get everybody back in here before we bring
you in. And when you come in, the foreperson, whoever you
decide the foreperson to be, will bring in, will come in
carrying that envelope.

With that, the Court's going to recognize Ms. Bove to
begin the -- I guess the opening of the closing arguments.
Ms. Bove? Yes, sir? Lights, you want them off the whole time?

MR. BERRY: Yes.

THE COURT: Okay.

CLOSING ARGUMENT BY THE GOVERNMENT

MS. BOVE: May it please the Court.

THE COURT: Yes, ma'am, thank you.

MS. BOVE: Counsel, ladies and gentlemen of the jury,
on behalf of myself and my co-counsel, we thank you for your
service. We started out this trial, Ms. Monica Davis told --
Daniels, excuse me, told us what we anticipated evidence was
going to show. Then we showed you the evidence. Now we're
going to wrap it up all for you.

We got four counts here. The Judge just read you the

indictment.  Count 1, production of child pornography.  Count
2, production of child pornography while being required to
register as a sex offender.  Count 3, possession of child
pornography.  Count 4, sex trafficking of a minor.

We'll start with Count 1, production.  First, the
Defendant used the minor to engage in a sexually explicit
conduct.  Let's do the easy stuff first.  Sexually explicit.
You've seen 6.5.  Sexually explicit.  You've seen 6.1, 6.2, all
of them sexually explicit.

Second, the Defendant acted with the purpose of
producing a visual depiction.  Third, a visual depiction was
produced using materials that have been mailed, shipped, or
transported in or affecting interstate commerce.  I'm not going
to play you the video again.  I'm not going to make you watch
that.

I am going to show you the redacted image.  You can
tell here, it's sexually explicit.  You can tell there's a
visual depiction.  You can tell he's a minor.  I am going to
ask you to listen to it.

(Audio played at 11:51 a.m. to 11:51 a.m.)

MS. BOVE:  Are you recording me.  No, no, I'm not.
Yes, I am.  It's the purpose.  We've seen a lot of evidence
that Victim-1 [redacted]'s a minor.  The judge told you, you're
permitted to draw such reasonable inferences as you feel are
justified in light of common experience.  You do not have to

check your common sense at the door.  You saw Victim-1 [redacted].  You heard from his parents, you heard from Norma. No doubt that that's Victim-1 [redacted] in the video.

Now we turn to the Defendant.  Is it the Defendant in the video?  Well, it's found on his phone.  Told you it's his phone.  It was made on his phone.  You heard Mr. Ali tell you it's made on this phone.  He told you, the Defendant told you it took place in his house.

Then you heard the testimony of Norma Madrid.  She has known the Defendant over a decade.  She has -- excuse me. Not over a decade, but about seven years.  He has lived with her, they've talked on the phone countless times.  She told you that she listened to that video three times.  Three times.  She wanted to confirm it was the Defendant.  She could not believe it.  Three times.  And when she stood on that stand under oath, she told you not a doubt in her mind that's the Defendant's voice.

You heard Father of Victim-1 [redacted] state on that stand and tell you the same thing.  He listened to that voice, he told you it's the Defendant.  Same thing with Stepmother of Victim-1 [redacted].

Then we have the visual evidence.  So what you see on the left is a screenshot of 6.2.  What you see on the right is a search warrant photo that we showed you.  When you zoom in on the search warrant photo, what do you see?  Same black shoes.

Not the only pair of black shoes the Defendant has.  Here's
another one from the search warrant videos.

          And what do we see in the production video?  We've
got the white sock, the blue sock, the red sandals, the black
shoes.  Same picture.  White sock, blue sock, red sandals,
black shoes.  There's the Defendant.  That's the excerpt from
the production video.  Defendant told you that's him holding
his phone.  There's Victim-1 [redacted].  Blue sock, white
sock, red sandals.

          Victim-1 [redacted]'s got no shirt on.  Blue sock,
white sock, red sandals.  There's the Defendant.  Defendant
told you that's not his penis.  But he did tell you the one on
the right is.  It's his couch, his living room.  Told you not
his penis, looked different.  So you look.

          Oh, what else do we see here?  There's that black
shoe.  And what you're looking at here is the image that the
Defendant told you he texted to somebody else.  There's that
black shoe.  You compare the penises.  Pay attention to the
circumcision scars.  Look at the head of the penis.

          You want to know what the Defendant was doing on
October 4th when the video was produced?  Take a look at
Exhibit 14.  Look at Pages 765 through 788.  That's the date of
the production of the video.  He text Norma.  You heard him on
the stand, he said he's texting Norma.  Search for a BMX bike,
told you he searched for a BMX bike for Victim-1 [redacted].

1          The production of the video happens.  He texts Chris
2    Villa.  You're looking at it here.  Here's an excerpt of 14.
3    Video's produced on 4:53 p.m., 4:19 p.m., searching for Dick's
4    Sporting Goods bikes.  BMX bike, same bike.  You heard the
5    testimony from Mr. Haislip.
6          Now let's deal with interstate commerce.  You heard
7    the instruction, cell phone equals faculty -- facility of
8    interstate commerce.  Saw this picture.  Manufactured in
9    Vietnam.  We are not in Vietnam.  It got here somehow.
10          Turning to 2260(a), Count 2.  Find the Defendant
11   produced child pornography.  That's Count 1, we just went
12   through it.  Second one, he was registered to commit -- he was
13   committed Count 1, and he was required to register as a sex
14   offender.  Sat on that stand, told you he was required to
15   register as a sex offender.
16          But if you needed more, you have the testimony of
17   Detective Wendy Welch.  You've got documents in Exhibit 2,
18   shows his sex offender registry documents.  We didn't spend any
19   time on documents for Exhibit 3, but they're in evidence, and
20   those are the conviction documents for the victim, Victim-3
21   [redacted].
22          We're on to Count 3, possession.  First, the
23   Defendant knowingly produced visual depiction of a minor
24   engaging in sexually explicit conduct.  You've seen the
25   sexually explicit conduct, you've seen the visual depiction,

1  you've seen the minor.

2  Let's go to knowingly possessed. We're going to go

3  to affecting interstate commerce. Minor. Here we are. This

4  is on the Defendant's phone. We're not going to watch the

5  video again. I'm showing you the redacted image. It's on the

6  Defendant's phone. That's the location. Mr. Ali testified

7  where it's from. It says forensic analysis that found this.

8  This is the thumbnail. You remember Mr. Ali's

9  testimony about how thumbnails are generated? Two thumbnails

10  in this case. First thumbnail generated about an hour and a

11  half after the video was produced. What does that mean?

12  Somebody went into the gallery. That's how it's generated.

13  Second thumbnail produced on October 21st. Somebody

14  watched the video. It's not the day Norma watches the video.

15  You heard Norma's testimony. That was October 24th.

16  Then the Defendant said on that stand, he told you,

17  those are his Telegram groups. You heard the kind of contact

18  that came in through the exhibits of what was happening on

19  Telegram. Then you saw the two images that were on the

20  Defendant's phone.

21  And you heard Mr. Ali's testimony that images are

22  only saved to the phone if viewed. And now we're going to look

23  at those images. You've got minors depicted in sexually

24  explicit conduct. These are on the Defendant's phone.

25  We're on to Count 4, sex trafficking. First, the

Defendant knowingly recruited, patronized, and solicited by any means Victim-1 [redacted]. Second, the Defendant committed such act knowing or in reckless disregard of the fact that the person had not attained the age of 18 years old, and would be cause to engage in commercial sex acts. And third, in or affecting interstate or foreign commerce. You saw Victim-1 [redacted]. Is he 18? Heard his testimony, you know his date of birth.

Commercial sex, what does that mean? You got an instruction on that. Commercial sex does not mean I give you $100, you perform a sex act on me. Commercial sex means any sex act on account of which anything of value is given to or received by any person. Look at the commercial sex. 4/19, BMX bike searched for. 4/43, video produced.

What we're looking at on the left, that's from the Defendant's phone. He told you he took those pictures. What we're looking at on the right, that's the receipt. $410.39. Went to Chuck E. Cheese. He used his Visa debit card to pay for it. Brought Victim-1 [redacted]. He won a gumball machine.

We've got the Wal-Mart, interstate chain, national chain. Buys the hoverboard and the cart. Pays with his Visa debit card. There's Victim-1 [redacted] on that hoverboard and cart. He's got the Nike shoes. He's got the chain. They've got the charge for the chain.

1       And remember what Victim-1 [redacted] told you. The
2 Defendant parked the car at a gas station. Defendant told him
3 he had more stuff that Victim-1 [redacted] could do for money,
4 but it was personal. And what did Victim-1 [redacted] show
5 you? The hand gesture. That remind you of anything?

6       Let's add up the total value of everything we've just
7 gone through. We've got the hoverboard. It's $197.94. We've
8 got the chain, $64.80. BMX bike, $410.39. Don't even know how
9 much the Nike shoes are. Chuck E Cheese, $30.40. $703.60.
10 This happened between October 2nd and October 25th.

11       $703.60 in 23 days for an 11-year-old boy to wash
12 your car, mow your lawn, clean your house? How much does a car
13 was cost? Well, you heard the Defendant. He sat on the stand,
14 told you -- that's him saying in the video you pay $16 for
15 this? Again, you have the instruction, common sense.

16       You want to, go back and listen to what Victim-1
17 [redacted] says in Government's Exhibit 11.20. That's the $16.
18 And you heard the testimony from Father of Victim-1 [redacted]
19 and from Stepmother of Victim-1 [redacted]. They saw that car.
20 It was dirty. You've seen evidence of the Defendant washing
21 his own car in that time period.

22       Means or facilities of interstate commerce such as
23 telephones, the internet, or whether this conduct substantially
24 affected the interstate commerce by virtue of the fact that the
25 purchased items that had moved into interstate commerce. You

saw the lube. You saw the inspection on the -- inscription on

the lube. Not made in Texas. That's the same lube that

Victim-1 [redacted] sat in here and told you about the

Defendant applying to his penis to try to insert his penis into

Victim-1 [redacted]'s anus.

You have the testimony from the individual who owns

Payne's Bikes. That bike the Defendant bought for Victim-1

[redacted] was not made in Texas. You aw the use of the

Defendant's cell phone to get permission to keep Victim-1

[redacted] at his house. He's texting his parents. You hear

the Defendant let Victim-1 [redacted] use his phone to watch

TikTok. Victim-1 [redacted] told you that. Used the internet

on the phone to show Victim-1 [redacted] the bike he was going

to buy him, went to national chain stores like Wal-Mart,

Walgreens, Chuck E. Cheese to buy these items.

Here's the lube. It's where it's made. It's where

it's distributed. Here are the text messages. What time does

Victim-1 [redacted] have to be home? He needs to be home by 8.

Victim-1 [redacted] told you that the Defendant put on

pornography to show him boy-on-boy, girl-on-girl. Defendant

testified this is his, his TV. He searched those things on

this Exhibit.

You've got the BMX bike. Again, not made in Texas.

Got all of these multinational places. We've got Visa,

Walgreens, Wal-Mart, Chuck E. Cheeses. Defendant's 5.5.

1 You've seen all the evidence, you've seen all the facts, you

2 have all the law. We ask you to do justice here and provide

3 guilty on all counts.

4    THE COURT: Thank you, Ms. Bove.

5    Mr. Velasquez?

6     CLOSING ARGUMENT BY THE DEFENSE

7    MR. VELASQUEZ: May it please the Court.

8    THE COURT: Counsel.

9    MR. VELASQUEZ: Ladies and gentlemen of the jury.

10 First of all, I too would like to thank you for your attention

11 through this trial. I know it's been a difficult trial to

12 watch. But there are four things that would give you pause in

13 this trial. I will give you four reasons to pause as to

14 whether Martin Renteria is guilty or not guilty.

15    The first one that would cause you pause is the fact

16 that they tested Victim-1 [redacted]. They took swabs of

17 Victim-1 [redacted] for DNA. And when they did that, none of

18  Mr. Renteria's DNA was found on -- or none of Mr.

19 Renteria's DNA was found, or accumulated from Victim-1

20 [redacted]. So that's one thing.

21    Then you have Mr. Renteria's phone. It was not

22 tested for DNA. It was not dusted for fingerprints. So we

23 don't know who all handled that phone. And there was testimony

24 that at Mr. Renteria's house there were innumerous individuals

25 that would come and go at that house. And there was no

investigation, no checking to see if there was anyone else who had access to that phone.

There was several people who had access, that came out in the testimony. And in addition to that, they had access to the passcode. So there were several individuals who had access to that phone and could have been involved in that video.

Now, we're not pointing the finger at anyone specific. We just don't know who is in that video. You had Mr. Renteria testify, and he stated it wasn't him. So it's up to you, of course, the credibility of Mr. Renteria's testimony. But based on all of these things, the fact that Mr. Renteria's DNA was not found on Victim-1 [redacted], his phone was not tested, there were several people who handled the phone who could have been involved with that video. And you had Mr. Renteria's testimony.

Based on these things, we would ask, we would contend that there's a reasonable doubt as to the guilt of Mr. Renteria. And we would ask that you find him not guilty. Thank you.

THE COURT: Thank you.

Mr. Berry?

CLOSING ARGUMENT BY THE GOVERNMENT

MR. BERRY: So this is boiling down to there wasn't DNA, like this is an episode of CSI and we failed to give you

the DNA. And, therefore, he must not be guilty.

But, of course, remember the testimony and the testimony of their DNA expert they put on the stand. What did he say about that DNA, and what were the likelihood of finding DNA that was swabbed on October 27th after that man tried to anally rape that boy more than 72 hours before.

You heard the witness testify that after 24 to 48 hours, highly unlikely to find such a thing. In fact, there was no DNA out of the boy when they swabbed him himself, not even his own DNA. Of course, they touched him, and that just shows you what -- how sort of ephemeral DNA is, how difficult it is to capture sometimes.

And using that lubricant reduces the chances that it's going to be found there, and all that sort of stuff. Right? You heard that testimony. I think it was -- you can judge it for yourself. It was pretty clear that the probabilities of finding that at that point in time were highly unlikely.

But are we really going to sit here and evaluate the specter of this DNA that is missing when we had a video, video evidence that a sexual assault occurred? Like, that's not a question. It's not in question whether the sexual assault occurred. It did. We don't have DNA from it. Are we going to believe the lack of DNA off of a q-tip swab off of a child taking at a hospital days and weeks later, or are we going to

believe our own eyes in the video?

I think you have plenty of evidence to support that it's clearly Victim-1 [redacted] and it's clearly that man. This is a man who told you that he lied in college over a petty thing because he wanted to get to class. And who did he throw under the bus that time? Right? It was his brother I think he said. Threw his brother under the bus, gave him his name, and lied under oath at that time.

If he'd lie about something that small, do you think he'd throw someone else under the bus? Chris Villa, you think he'd throw that man under the bus? That poor guy gets called in here and says hey, this guy says you're a pedophile. If he'll lie when he's in his 20s about getting to class and throw his brother under the bus, do you think he'll lie about this somewhat close friend and accuse him of that? And the answer of course is yes, he will. That's what he does.

Why did he do it back then? Why did he lie that time about the insurance thing and give him the other name? Because he's trying to save himself, because it was more convenient for him. Because it was good for him.

He's lying now for the same reason. He does not want to accept responsibility for what he has done to not just Victim-1 [redacted] but to Victim-2 [redacted], too, and Victim-3 [redacted]. Pled guilty. Stood up in court. Swore under oath I did it. But now here before you, ladies and

gentlemen, not really.  Didn't do it.  Just kidding.  Oops, my
bad.  Sorry about lying in front of that judge.

     But don't worry, not lying in front of this judge and
you good people.  I just lied then.  I lied then when in my
20s, I lied under oath in court when I stood up and pled
guilty.  But trust me, not lying now.

     Ladies and gentlemen, this is your opportunity.  This
is your opportunity to hold that man accountable for his
actions.

     THE COURT:  If you need to communicate with me during
your deliberations, the foreperson should write the message and
give it to the court security officer.  I'll either reply to
you in writing, or bring you back into court to answer your
message.

     Bear in mind that you're never to reveal to any
person, not even to the Court, how the jury stands numerically
or otherwise on any count of the indictment until after you've
reached a unanimous verdict.

     As you deliberate, we're going to have to say goodbye
to our alternates who we could not have done this without.  And
we appreciate them.  I'm going to ask Mr. Davis and Ms. Russell
if you would retire in a moment with the jury.  If you have
anything in the jury room, collect those items and come on out.
And I'll meet you out here at the east end of the hallway.  I'd
like to visit with you for just a few minutes privately.  I'll

1 give you a certificate of appreciation, as well.

2        With that, you now may take your notebooks with you

3 if you so choose.  You don't have to if you don't want to.

4 Let's rise for this jury as they retire to deliberate.  Thank

5 you.

6     (Jury out at 12:13 p.m.)

7        THE COURT:  Let's have a seat.  Outside the presence

8 of the jury.  Mr. Berry, anything further you need to take up

9 before we --

10        MR. BERRY:  No, Your Honor.  I owe Ms. Lerma the

11 contraband exhibits.

12        THE COURT:  Okay.

13        MR. BERRY:  I had given her a thumb drive with non-

14 contraband.  She went and loaded it on the jurors.  I've now

15 asked for that back, and I'm going to put the contraband on it

16 so she can go load it directly onto the jury's computer back

17 there for their evidence review.  And then the Court does what

18 it does at that point.

19        THE COURT:  Thank you.  From the Defense, anything we

20 need to put on the record?

21        MR. COLTON:  No, Your Honor.

22        THE COURT:  We're good?

23        MR. COLTON:  Thank you.

24        THE COURT:  All right.  If you leave the area, make

25 sure we can get you back here in five or ten minutes, please.

1 Thank you all.

2      (Recess at 12:14 p.m./Reconvened at 1:44 p.m.)

3      (Outside the presence of the jury; defendant present)

4      THE COURT:  Outside the presence of the jury, and

5 Mr. Renteria is here along with all the attorneys.

6      We've got a jury note, Mr. Renteria, and I've talked

7 to the attorneys together for both sides at the same time.  And

8 the jury question was, we need more explanation of the special

9 interrogatory form.  And that's that second, the very last page

10 of the instructions or second page of the verdict form.  And it

11 says, we need more explanation of the special interrogatory

12 form.  What are we answering "was" or "was not" for?  And I've

13 talked to the attorneys.  Our plan is that we'll bring the jury

14 back in here.

15      I'll dim the lights in a minute so that we've got up

16 on the screen just a copy of that second and the last page,

17 that final page, the verdict form.  It says special

18 interrogatory.

19      And Mr. Renteria, it's important that I give then

20 something, I guess, but I don't want to comment at all on, and

21 give anything outside of what they already have.  And so your

22 attorneys and attorneys for the Government have agreed that I

23 can read this form to them as they read it.  So perhaps they're

24 not all holding -- they only have one copy in the jury room, so

25 they're likely not all looking at it at the same time maybe.

And so this way they can look at it at the same time as I read it to them. And when I read it to them before, they weren't looking at it. So perhaps this will help. It's really not any explanation of it.

What I think I will do is I'll read it through once with the word "was" in there, and then read it through once with the words "was not" in there, so they can see it both ways. It's totally up to them. And I'm going to give them -- send them a jury note back in with them basically saying, you have your instructions; please continue to deliberate. And we'll leave it at that.

Mr. Colton, is that satisfactory with the Defense, or anything you want me to vary from that from what I've just said?

MR. COLTON: That's fine, Your Honor. We don't have any objection.

THE COURT: Mr. Berry, does that sound --

MR. BERRY: The only thing I was thinking of, since we talked back there, Your Honor, is whether it's worth -- you know, because we've got some "and/ors" in here, and making it clear to them that one, they only need to answer this if they find them guilty on Count 1 or Count 4. They don't have to find him guilty on both to answer this, and that that's the only reason they're here. For example, if they found him not guilty on both counts, you don't need to answer this question.

1 But if you found him guilty on 1 or 4, then go to this page and
2 answer it was or was not, and it doesn't have to be guilty on
3 both to answer this.

4          THE COURT:  I see.

5          MR. BERRY:  That's the only thing that I thought
6 might be --

7          THE COURT:  Helpful.

8          MR. BERRY:  -- something of an explanation.  That's
9 really not adding to anything, but it's just, we tried to
10 reduce the verbiage by not having a whole long string of things
11 here.  I think that might be helpful, but that's the only
12 suggestion I would make.

13          THE COURT:  It might be.

14          Mr. Colton?

15          MR. OGDEN:  You know, Your Honor --

16          THE COURT:  Or Mr. Ogden?

17          MR. OGDEN:  -- I mean, as I look at this, it's not
18 clear to me that if you were to read this and say the
19 Government hasn't met their burden to prove the enhancement,
20 that you would say "was not."  Because it says "We unanimously
21 agree by proof beyond a reasonable doubt," either "was" or "was
22 not," sort of implying that "was not" needs to be proven by
23 reasonable doubt.  I don't think that was the Government's
24 intent, but I -- I mean, maybe some sort of instruction, just
25 like the reasonable doubt instruction.  Or I guess I didn't see

that ambiguity until this question came.

THE COURT: Back on Page 2 where it says, "defines what a reasonable doubt is," or?

MR. OGDEN: Yes, sir, just it the special -- oh, oh, as to what -- I don't have it in front of me, Your Honor, but it would be the -- if the Government has not met their burden, that you'd have to say not guilty, whatever that type of instruction is.

MR. BERRY: The only other suggestion I would make -- and this would be a little bit more unusual -- obviously this was available to the defense. I see what he's pointing out now. What his concern is is that we're asking the jury to find beyond a reasonable doubt that he was not convicted of an offense there. And so he's suggesting that it's a burden-shifting issue.

The only solution I see to doing that would be to reword this altogether to say:

"We, the jury, unanimously agree by proof beyond a reasonable doubt that prior to committing the conduct charged in Counts I and/or IV, the defendant, Mark Renteria, was convicted for an offense in Nueces County, Texas, in which a minor under the age of 17 was a victim," and then a box underneath there that says "yes" or "no."

And if they don't find by proof beyond a reasonable

1 doubt that he was convicted of that, then they would check

2 "no," and that would not be a finding that they had to find

3 beyond a reasonable doubt that he was not convicted, and

4 instead it would be saying, "yes, we find beyond a reasonable

5 doubt that he was convicted." And if they don't find beyond a

6 reasonable doubt, then the answer is "no."

7         THE COURT: And that way you're not shifting the

8 burden to the Defendant?

9         MR. BERRY: That's the only suggestion I can make

10 that addresses counsel's issue now.

11         MR. OGDEN: I think we can stipulate to that being

12 there. I hate to change it, something that they've already

13 gotten. Again, I only just see this ambiguity because of the

14 note.

15         THE COURT: Right. Me, too.

16         If you all agree on that, I'm happy to give a

17 supplemental.

18         MR. BERRY: Just pull that interrogatory out and give

19 them a new one?

20         THE COURT: Yeah, put another special interrogatory

21 in. And we can type it up and you can look at it, and see if

22 you all want to do that or not. Okay, let us type it up, at

23 least, and then you all can decide yes or no.

24         MR. BERRY: Thank you, Your Honor.

25         THE COURT: I think that's a pretty good suggestion,

1  Mr. Ogden.  I just wish I'd seen it earlier.  Like you said, I

2  only saw it because they had the question.

3          All right.  We'll work on that.  We'll stand in

4  recess just a few minutes.

5          Marshal?

6      (Recess at 1:51 p.m./Reconvened at 2:03 p.m.)

7      (Outside the presence of the jury; defendant present)

8          THE COURT:  We are outside the presence of the jury,

9  and Mr. Renteria is present.

10         Ms. Means is going to give you a copy of what I

11 proposed to substitute for the original special interrogatory.

12         MR. BERRY:  Thank you.

13         THE COURT:  And I'll bring them in and read it to

14 them, just tell them by agreement of the parties, we're going

15 to substitute that.  And then when Ms. Lerma takes it in to

16 them, she'll come back with the old form, right?

17         MS. LERMA:  Yes, Your Honor.

18         THE COURT:  That one page.

19         Mr. Berry, any objection?

20         MR. BERRY:  I think that's fine, Your Honor.

21         THE COURT:  Mr. Ogden?

22         MR. OGDEN:  Your Honor, I think this does clear up

23 that ambiguity.

24         THE COURT:  Okay.  I'm sorry I didn't see it earlier.

25         MR. OGDEN:  And I apologize, too, Your Honor.

1     THE COURT:  I was telling Ms. Means, I think if I'd

2 just gone with what we have typically done before, I would have

3 done it this way, but I did it, and we all agreed that it was

4 fine.  So this particular jury just happened to have an issue

5 with it, I guess.

6     All right, Mr. --?

7     MR. OGDEN:  And then the only --

8     THE COURT:  Yeah?

9     MR. BERRY:  Sorry.  Then the only other thing would

10 be I would think it would be worth saying, that -- I noticed

11 you changed it from "and/or" to just "or," which I think is

12 probably fine as well, just to sort of emphasize to them that

13 when they get here, if you find guilty on I or IV; if you

14 don't, then you don't have to answer this.

15     THE COURT:  Is it okay for me to say that?

16     MR. BERRY:  Oh, I think so.

17     THE COURT:  Mr. Ogden, are you okay if I say that?

18     MR. OGDEN:  Saying that if he's --

19     THE COURT:  You only can do this if it's -- if you

20 find him guilty on I or IV.

21     MR. BERRY:  Or IV.

22     THE COURT:  That's what I said.  I just didn't say it

23 very loud.  I or IV.

24     MR. OGDEN:  I guess, to me, if --

25     THE COURT:  It already says it.

1          MR. OGDEN:  I know.

2          THE COURT:  I hate to -- I hate to say it again.

3          MR. OGDEN:  Yeah, that's -- that's where I'm coming

4  from.  It's not that that's really a legal objection.  It

5  just --

6          THE COURT:  That's fine.  I think that's fine.  I

7  won't do that.

8          MR. OGDEN:  Okay, thank you, Your Honor.

9          THE COURT:  Mr. Renteria, do you understand?

10          MR. RENTERIA:  Yes.

11          THE COURT:  We're just going to substitute -- we're

12  just going to substitute this one page for that page.

13  Hopefully that helps them, however that may be.  None of us

14  knows, none of us, including the Court, know.

15          Yeah, let's take that down.

16          MR. OGDEN:  Oh.

17          THE COURT:  None of us knows where they are at this

18  point, and so we'll -- we'll bring them in and do that.  Okay?

19          MR. COLTON:  Can we just put it up there?

20          THE COURT:  Yeah, sure, you can, that's fine.  I

21  don't see any big deal with that.

22          All right, let's bring the jury in.

23      (Jury in at 2:06 p.m.)

24          THE COURT:  Please be seated, thank you.

25          Ladies and gentlemen of the jury, the Court's

1   received your note. which says "We need more explanation of the
2   special interrogatory form.  What are we answering 'was' or
3   'was not' for?"  The Court's response is going to be very
4   simple.  The parties have come to an agreement to submit a --
5   or substitute a different special interrogatory.  It's the same
6   special interrogatory; it's worded differently, which will
7   hopefully help you.

8          I'm going to read it to you, and then when you go
9   back in, Ms. Lerma is going to come in immediately with you,
10  substituting the new -- the special interrogatory we're
11  substituting in and taking the old one.  And this way it
12  will -- it's the same thing.  It's just worded differently.  We
13  have it up on the screen.  We're going to hit the lights --
14  part of the lights here so that you can look at it as I read it
15  to you.

16          "Special interrogatory.  If you find the defendant,
17          Martin Renteria, guilty of the crime charged in Count
18          1 or Count 4, please answer the following.  Do you
19          unanimously agree by proof beyond a reasonable doubt
20          that prior to committing the conduct charged in Count
21          1 or Count 4, the defendant, Martin Renteria, was
22          convicted for an offense in Nueces County, Texas, in
23          which a minor under the age of 17 was a victim."

24          The foreperson would check "yes" or "no," whatever
25  the unanimous verdict is.  And again, the same statement as was

1  on the other one.  "For purposes of this question, convicted

2  means that a court has sentenced the defendant for the crime,

3  and minor means an individual under the age of 17."  So that's

4  worded a little differently.  It's -- like I said, parties have

5  agreed to submit this to you as a substitute special

6  interrogatory in hopes that that will clarify any discussion.

7         Meanwhile, you have all your evidence.  You have all

8  the evidence.  You have your instructions, and I'll ask you to

9  retire and deliberate, continue deliberations.  Thank you.

10         Let's rise for the jury, please.

11         (Jury out at 2:09 p.m.))

12         THE COURT:  Be seated, please.  Outside the presence

13  of the jury.

14         Mr. Berry, anything more you want to take up?

15         MR. BERRY:  No, sir.

16         THE COURT:  Mr. Ogden or Mr. --

17         MR. COLTON:  No, Your Honor, and thank you for the

18  Court's indulgence on that issue.

19         THE COURT:  Thank you, all.  I appreciate you all

20  assisting and coming to the conclusion.  We'll see if it helps

21  or not.  We'll be in recess.  I don't know if we want to stick

22  around for a few minutes.

23         Oh, and happy Marine Corps birthday.

24         UNIDENTIFIED SPEAKER:  Thank you, Judge.

25         THE COURT:  You don't look 246 years old.

1          UNIDENTIFIED SPEAKER:  I hide it well.

2          THE COURT:  You hide it very well.

3          Who else, Shannon is a Marine?  Do we have anybody

4     else?  Anybody else a Marine?  No?  I didn't say former Marine,

5     because you're always a Marine, right?

6          UNIDENTIFIED SPEAKER:  Right.

7          THE COURT:  Once a Marine, always a Marine.

8          Marine?

9          UNIDENTIFIED SPEAKER:  Army.

10         THE COURT:  Army, well, I'm talking Marine Corps.

11     (Recess at 2:11 p.m./Reconvened at 3:07 p.m.)

12     (Outside the presence of the jury; defendant present)

13         THE COURT:  We're back in session.  We're outside the

14    presence of the jury.  Mr. Renteria is back here with us.  The

15    attorneys are all here.

16         I've been informed that the jury has a verdict.  I

17    will tell you, the first note they sent out was signed by the

18    jury foreperson.  It was not numbered, so Ms. Lerma put a 1 on

19    it as far as the note.  The second one didn't have a number or

20    was signed.  It wasn't signed, either.  So this one wasn't

21    signed; the first one was.  So obviously they left that

22    signature alone.  She put number 2 on that just so we can keep

23    track of it.

24         Any objection to that from the Defense?

25         MR. OGDEN:  No, Your Honor.

1          THE COURT:  I don't know what else we could do to

2     keep track of that.

3          So the jury has got a verdict.  We're going to bring

4     the jury back in.  No matter what the jury verdict is, let me

5     be clear.  There will be no response.  Put on your best poker

6     face, everyone, because you'll be removed.  If I can remove

7     you, you'll be removed.  If you're part of the trial, then I'll

8     deal with you later, but no public display of any emotion,

9     please.  And we'll have them back in here.

10          And let's rise for this jury.

11     (Jury in at 3:09 p.m.)

12          THE COURT:  Thank you, please be seated.

13          Ladies and gentlemen of the jury, I have been

14     informed that the jury has reached a verdict.

15          Speaking through your foreperson, if you would stand,

16     ma'am.  Is that correct?  Has the jury reached a unanimous

17     verdict in this case?

18          JURY FOREPERSON:  Yes.

19          THE COURT:  All right, that answer being yes, if

20     you'll hand that to the Court's security officer.  Thank you,

21     ma'am.  Have a seat.

22          The Defendant will please rise.

23          THE CLERK:  In MO:20-CR-35 United States of America

24     vs. Martin Renteria.

25          Verdict form, Count 1.  We, the jury, find that

defendant, Martin Renteria, is guilty of the offense charged in Count 1 of the indictment.

Count 2.  We, the jury, find that defendant, Martin Renteria, is guilty of the offense charged in Count 2 of the indictment.

Count 3.  We, jury, find that defendant, Martin Renteria, is guilty of the offense charged in Count 3 of the indictment.

Count 4.  We, the jury, find that defendant, Martin Renteria, is guilty of the offense charged in Count 4 of the indictment.

Special interrogatory.  Do you unanimously agree by proof beyond a reasonable doubt that prior to committing the conduct charged in Count 1 or Count 4, the Defendant, Martin Renteria, was convicted of an offense in Nueces County, Texas, in which a minor under the age of 17 was a victim?  Answer, yes.

Signed by the foreperson of the jury, today's date.

THE COURT:  Thank you.  You may be seated.

Mr. Colton, does the defense wish -- Mr. Ogden, does the defense wish the Court to poll the jury?

MR. OGDEN:  Yes, Your Honor.

THE COURT:  Thank you very much.

Ladies and gentlemen of the jury, the Defense has requested that the Court poll the jury.  So I'm going to ask

1  you a question.  I'll ask it one time, and your answer will be

2  yes or no.  Does the jury's verdict reflect your individual

3  verdict?  Does your individual verdict, your personal verdict,

4  what the jury's unanimous verdict is that was just read?

5  You'll stay seated.  Ms. Lerma will call you out by number.

6          Ms. Lerma?

7          THE CLERK:  Juror number 1?

8          THE COURT:  Yes or no?

9          JUROR NO. 1:  What is the question?

10         THE COURT:  Does your personal verdict, is it

11  reflected by the jury's verdict?

12         JUROR NO. 1:  Yes.

13         THE COURT:  Do you agree with the jury's verdict?

14         JUROR NO. 1:  Yes.

15         THE COURT:  Number 2?

16         THE CLERK:  Juror Number 2?

17         JUROR NO. 2:  Yes.

18         THE CLERK:  Juror Number 3

19         JUROR NO. 3:  Yes.

20         THE CLERK:  Juror Number 4?

21         JUROR NO. 4:  Yes.

22         THE CLERK:  Juror Number 5?

23         JUROR NO. 5:  Yes.

24         THE CLERK:  Juror Number 6?

25         JUROR NO. 6:  Yes.

1      THE CLERK:  Juror Number 7?

2      JUROR NO. 7:  Yes.

3      THE CLERK:  Juror Number 8?

4      JUROR NO. 8:  Yes.

5      THE CLERK:  Juror Number 9?

6      JUROR NO. 9:  Yes.

7      THE CLERK:  Juror Number 10?

8      JUROR NO. 10:  Yes.

9      THE CLERK:  Juror Number 11?

10     JUROR NO. 11:  Yes.

11     THE CLERK:  Juror Number 12?

12     JUROR NO. 12:  Yes.

13     THE COURT:  Thank you.

14        Ladies and gentlemen of the jury, your obligation is

15 completed, and you're released from your oath.  That means you

16 can speak with anyone you want to about the case.  That also

17 means you can speak with absolutely no one, if you'd rather not

18 speak about the case.  That's totally up to you, no matter who

19 asks.  We thank you very much for your service.  I'm going to

20 ask you to retire one more time for me and wait for me for a

21 few minutes.  I have a little bit of business to do with the

22 lawyers.  Within two to three minutes I'll be back there in the

23 jury room with you.  I'll speak with you privately behind

24 closed doors for just a few minutes as long as you want to talk

25 to me, and then we'll be done, okay?

1     With that, let's rise for this jury as they retire

2  for the final time.

3     Thank you.

4   (Jury excused at 3:13 p.m.)

5     THE COURT:  Please be seated.  The jury having

6  returned the verdict of guilty, Mr. Renteria, the Court will

7  set your sentencing hearing for February 11, 2022 at 9:00 here

8  in this courtroom.

9     In the meantime, I'm going to refer the case to the

10  U.S. Attorney's Office.  They're going to prepare a presentence

11  investigation report.  You'll have input in the making of that

12  report.  Your attorney's going to shepherd you, guide you

13  through that process.  Your attorney then will receive a copy

14  of the report well before your sentencing hearing.  He'll very

15  carefully go through that.  He'll go through it; he'll share

16  information from it with you, and then he'll file objections if

17  there are objections he's able to file on your behalf to the

18  report.

19     The Government has the same right to do that, as

20  well.  If there are objections from either party that remain

21  unresolved at the time of your sentencing, then we'll take

22  those up at your sentencing hearing and I'll make those

23  decisions.  I'll tell you what I find the guideline range to be

24  in your case at that point after I determine what they are, and

25  then I'll, of course, hear from your attorney who will speak on

1  your behalf.

2          But you have the right, and you'll have the

3  opportunity to speak to me as well, as will victims if they

4  choose to do so at that hearing.  And then I'll sentence you

5  after all that's wrapped up before that hearing is over.

6          Do you have any questions, Mr. Renteria?

7          THE DEFENDANT:  No.

8          THE COURT:  All right, thank you very much.

9          Mr. Berry, anything further on behalf of the

10 Government today?

11         MR. BERRY:  No, thank you, Your Honor.  Thank you.

12         THE COURT:  Mr. Ogden?

13         MR. OGDEN:  No, Your Honor, thank you.

14         THE COURT:  Thank you very much.  Well-tried case.  I

15 appreciate everybody's hard work, and you guys were kind of on

16 warp speed to think that we could get this trial done this

17 quickly.  I appreciate it, but I think it was very well done.

18 It was just efficient, and I thank you.

19         Mr. Renteria, I remand you to the custody of the

20 United States Marshals to await your sentencing.  Good luck to

21 you then.  I know you got a lot of things going on between now

22 and then, so we'll see you back here then.

23         And we'll be in recess just briefly.

24     (Proceedings concluded at 3:16 p.m.)

25                     *  *  *  *  *

1 **C E R T I F I C A T I O N**

2          We, DIPTI PATEL, MICHELLE ROGAN, and PHYLLIS

3 SULLIVAN, court approved transcribers, certify that the

4 foregoing is a correct transcript from the official electronic

5 sound recording of the proceedings in the above-entitled

6 matter, and to the best of our ability.

7

8 /s/ Dipti Patel

9 DIPTI PATEL, CET-997

10

11 /s/ Michelle Rogan

12 MICHELLE ROGAN

13

14 /s/ Phyllis Sullivan

15 PHYLLIS SULLIVAN

16 LIBERTY TRANSCRIPTS          DATE: January 3, 2022

17

18

19

20

21

22

23

24

25